Michael STEVENS, Plaintiff–Respondent,

v.

Steve CRAFT, Defendant–Appellant.

No. 21115.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 21, 1997.

Motion for Rehearing or Transfer to
Supreme Court Denied Nov. 12, 1997.

Application to Transfer Denied
Dec. 23, 1997.

William R. Robb, Timothy B. O'Reilly, Price, Fry & Robb, P.C., Springfield, for Defendant–Appellant.

James E. Corbett, Kurt J. Larson, Corbett & Larson, Springfield, for Plaintiff–Respondent.

PARRISH, Presiding Judge.

Steve Craft (defendant) appeals a judgment entered following a jury trial awarding Michael W. Stevens (plaintiff) damages for personal injuries sustained when the parties' pickup trucks were involved in a collision. This court affirms.

On April 27, 1991, plaintiff was visiting at the Herman Ferguson residence on Ramsey Street in Springfield, Missouri. Mr. Ferguson's house was located across the street from defendant's house. Plaintiff had two children with him in his pickup truck. He was parked in Mr. Ferguson's driveway. After talking with Mr. Ferguson for 15 or 20

minutes, plaintiff prepared to back out of the driveway and be on his way. He was in his pickup, continuing to talk to Mr. Ferguson, when he looked over his shoulder and saw defendant preparing to back a truck from defendant's driveway on the other side of the street.

Plaintiff testified, "And at that point he was already in the middle of the road, and was coming at me at a much higher rate of speed than I knew he was going to be able to stop his truck." The back of defendant's vehicle struck the back of plaintiff's vehicle.

Plaintiff got out of his vehicle and approached defendant's vehicle. He told the jury he did not experience pain immediately after the accident. He explained, however, "And that evening, the more that I sat at the house and on the couch, it felt like my head and my neck was getting stiff as I sat there." The next morning plaintiff testified he was "totally stiff." He testified, "I was almost to the point that I couldn't turn my head at all. But I had a little movement up and down, a little movement back and forth, but it hurt to move my head any at all." About two weeks later he saw a physician.

Plaintiff consulted Dr. Donald Eugene Menchetti. Plaintiff complained of a stiff, popping neck and soreness across his shoulders. Dr. Menchetti prescribed warm packs, muscle relaxants, anti-inflammatory agents, an injection of steroids and range of motion exercises. Plaintiff returned to Dr. Menchetti nine days later complaining of continued neck problems and headaches. A stronger anti-inflammatory medication was prescribed. An X-ray was taken. It revealed no abnormality. Plaintiff returned again five or six weeks later complaining that his neck was still stiff. Dr. Menchetti referred plaintiff to Dr. Canlas, a neurosurgeon.

Dr. Canlas examined plaintiff. He submitted an initial report to Dr. Menchetti confirming Dr. Menchetti's impressions that plaintiff's pain was a musculoligamentous type of pain typical in a cervical strain—a pulled muscle or strained muscle and ligaments. Dr. Canlas ordered an MRI. The MRI disclosed that plaintiff had two ruptured discs.

In a second report to Dr. Menchetti, Dr. Canlas recommended surgery. Dr. Menchetti explained that, in his opinion, the condition for which surgery was recommended was a condition that had existed for years; that it predated the accident. He stated his opinion that the preexisting back condition, combined with the muscle strain, created a chronic musculoligamentous strain.

Plaintiff elected not to have surgery. He continued to take medication and changed the activities in which he engaged. Plaintiff testified that he had to be careful in order to avoid "putting [his] back out of place." He was careful when he lifted things. He avoided lifting items weighing more than 35 to 40 pounds.

Plaintiff is a plumber. After the accident he could not crawl into spaces and turn his head to work underneath houses. Because of his condition, plaintiff changed from residential work to commercial work. He explained he had to take a foreman position that did not require him to do the physically demanding type of work he had done before the accident.

This court initially addresses an issue concerning defendant's brief. Plaintiff suggests the statement of facts in defendant's brief fails to comply with requirements of Rule 84.04(c) for statements of fact to fairly and concisely state facts relevant to the questions presented for determination without argument. Plaintiff requests this court to strike defendant's brief and dismiss the appeal. This court declines.

Although defendant's statement of facts is hardly a model of compliance with Rule 84.04(c), it does not give a distorted and unbalanced view of the evidence to the extent that occurred in *Estate of DeGraff*, 560 S.W.2d 342 (Mo.App.1977); nor does defendant's statement of facts approach the outright misrepresentation, sarcasm and unbridled argument that led to dismissal of the appeal in *Vodicka v. Upjohn Co.*, 869 S.W.2d 258 (Mo.App.1994). Nevertheless, defendant's appellate counsel would be well advised to more carefully scrutinize the record on appeal in drafting statements of fact in future appeals.

Defendant's first allegation of trial court error is directed to the trial court denying defendant's motion for directed verdict. Defendant contends plaintiff failed to prove causation for the injuries he alleged were sustained in the accident. Defendant argues the evidence was uncontroverted that plaintiff had preexisting injuries, and no doctor testified to a reasonable degree of medical certainty that the pain about which plaintiff complained was the result of injuries the accident produced. Defendant argues further that the "sudden onset rule" is not applicable in this case to prove causation.[1]

Dr. Menchetti was asked if he could state within a reasonable degree of medical certainty what type of injury plaintiff sustained in the accident. He testified that plaintiff suffered a cervical strain. After he stated the opinion that plaintiff suffered a cervical strain, Dr. Menchetti was asked if the cervical strain would be a condition that would be more aggravating in view of the preexisting conditions that had been disclosed. Dr. Menchetti said he thought the preexisting conditions could be aggravated by a cervical strain.

"[T]he testimony of a physician concerning a diagnosis of a patient is admissible even when it is not based on a reasonable degree of medical certainty." *Johnson v. Creative Restaurant Mgmt.*, 904 S.W.2d 455, 459 (Mo.App.1995). The terms "think," "guess" or "suggest" do not render an expert witness's testimony inadmissible if the expert intended to express his opinion or judgment. *Id.; Lineberry v. Shull*, 695 S.W.2d 132, 136 (Mo.App.1985). It is obvious that Dr. Menchetti intended to express his opinion or judgment with respect to what caused plaintiff's ailments.

There was medical evidence of causation. Defendant's challenge to the applicability of the sudden onset rule need not be addressed. However, *see Berten v. Pierce*, 818 S.W.2d 685, 687 (Mo.App.1991), for a discussion of the applicability of that rule in cases involving a preexisting condition or an intervening factor.

Plaintiff presented medical evidence of causation. The trial court did not err in denying defendant's motion for directed verdict. Point I is denied.

Defendant's second allegation of error contends the trial court erred in overruling a "motion in limine and objections to the videotaped testimony of Dr. Donald Menchetti regarding future surgery because no health care provider had testified to a reasonable degree of medical certainty that [plaintiff] would require future surgery to remedy injuries sustained by [plaintiff] in the ... accident." Defendant contends a "false issue" was injected into the case. Plaintiff responds that Point II was not preserved for appellate review. This court agrees. Point II was not preserved for appellate review.

Point II complains of two rulings by the trial court. It contends the trial court erred in overruling a motion in limine and in overruling objections to videotaped testimony of Dr. Menchetti regarding possible future surgery to which plaintiff might be subjected. As plaintiff points out, defendant did not object when the evidence about which he complains was offered at trial.

Defendant's brief suggests an argument was made at the hearing on the motion in limine that was consistent with the allegation in Point II. There is no record of a hearing on the motion in limine in the record on appeal. Regardless, as this court explained in *Slankard v. Thomas*, 912 S.W.2d 619 (Mo. App.1995):

A ruling on a motion in limine is interlocutory in nature. *Ellis v. Jurea Apartments, Inc.*, 875 S.W.2d 203, 210 (Mo.App. S.D.1994). It is a timely objection at trial, when the evidence is offered, which preserves the matter for review, and not the rejection of a motion in limine. *Id. See also Honey v. Barnes Hospital*, 708 S.W.2d 686, 694 (Mo.App. E.D.1986). A

---

1. The sudden onset rule applies in cases where a physical disability develops immediately after a negligent act and the injury is the type normally sustained by such negligence, such as a broken bone, a continuing back pain, or an obvious wound. *Tucker v. Wibbenmeyer*, 901 S.W.2d 350, 351 (Mo.App.1995); *Pruneau v. Smiljanich*, 585 S.W.2d 252, 255 (Mo.App.1979). Causation is inferred. *Tucker, supra*.

party waives any objection by failing to object when evidence, which had been the subject of a motion in limine, is offered at trial. *Graf v. Wire Rope Corp.*, 861 S.W.2d 588, 590 (Mo.App. W.D.1993).

*Id.* at 627–28.

Dr. Menchetti's videotaped testimony was the first evidence presented the morning of April 2, 1996, the second day of trial. Immediately before the jury was brought into the courtroom, the trial court stated that plaintiff's attorneys wanted "to pre-admit some exhibits." An item-by-item description was given of the exhibits plaintiff wished to offer in evidence. The discussions between the respective attorneys and the court covers six and one-half pages of transcript. One of the exhibits was Dr. Menchetti's deposition. Plaintiff's attorney informed the trial court and opposing counsel, "Plaintiff's Exhibit 41, which is Dr. Menchetti's deposition." Defendant's attorney responded, "No objection."

At the conclusion of the itemization of exhibits, the trial court announced, "All right. All those are pre-admitted then." The jury was then brought into the courtroom and Dr. Menchetti's videotaped testimony was played. Point II is denied.

Point III alleges the trial court erred in refusing two withdrawal instructions defendant tendered at the instruction conference following the close of all the evidence. Instruction No. E was directed to future medical expenses; Instruction No. F to future surgery. Defendant contends no medical testimony to a reasonable degree of medical certainty was offered that either future medical expenses or future surgery would be required as a result of the injuries sustained by the accident. He further argues that the withdrawal instructions should have been given because plaintiff abandoned the issues the instructions addressed and acknowledged they would not be pursued in closing argument.

At the conclusion of the instruction conference, the trial court advised the parties that certain instructions had been tendered that would not be submitted. The judge stated, with respect to Instruction No. E, "E is a withdrawal instruction on future medical expenses, [M.A.I.] 34.02, submitted by defen-

dant. I have declined to submit that but that's only on the assurance by plaintiff that they do not intend to argue for future medical expenses." And, with respect to Instruction No. F, "Instruction F is a withdrawal instruction, [M.A.I.] 34.02, on future surgery. I have declined this but once again only on the representation of plaintiff that they will not argue for future surgery."

■ Withdrawal instructions may be given when evidence on an issue has been received, but there is inadequate proof for submission of the issue to the jury, *Arnold v. Ingersoll–Rand Co.*, 908 S.W.2d 757, 764 (Mo.App. 1995); when there is evidence presented which might mislead the jury in its consideration of the case as pleaded and submitted, *Id.;* when there is evidence presented directed to an issue that is abandoned, MAI 34.01, General Comment; or when there is evidence of such character that might easily raise a false issue, *Shady Valley Park & Pool v. Fred Weber, Inc.*, 913 S.W.2d 28, 36 (Mo.App. 1995). A withdrawal instruction is also appropriate in clarifying damages for the jury. *Brazell v. St. Louis Southwestern Ry. Co.*, 632 S.W.2d 277, 285 (Mo.App.1982).

> While MAI 34.02 is called a "withdrawal" instruction, its use is not limited to withdrawing evidence which is accidently or improperly admitted. It is intended rather to clarify what the jury is to consider in assessing damages.

MAI 34.02, Committee Comment.

■ Determining whether to give a withdrawal instruction is a matter that is within the trial court's discretion. *Heifner v. Synergy Gas Corp.*, 883 S.W.2d 29, 34 (Mo. App.1994). An abuse of discretion occurs only when a trial court's ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration. *Id.* There is no abuse of discretion if reasonable persons could differ about the propriety of the trial court's decision. *Id.*

■ Instruction No. E states:

> The issue of plaintiff's future medical expenses is withdrawn from the case and

you are not to consider such issue in arriving at your verdict.

There was evidence presented that muscle relaxers and anti-inflammatory medication were prescribed to treat plaintiff's cervical strain. Dr. Menchetti was asked if, in light of the fact that he continued to prescribe medication for plaintiff, he expected plaintiff's neck complaints to resolve or believed them to be permanent. He answered, "It appears that they are going to be permanent."

■ At the time of trial, plaintiff testified he continued to occasionally take muscle relaxers in order to sleep. The accident occurred April 27, 1991. The trial was in April 1996. Long continuation of pain attributable to the act that is the subject of a trial is sufficient to warrant an instruction on damages attributable to future pain. *Chaussard v. Kansas City Southern Ry. Co.*, 536 S.W.2d 822, 828–29 (Mo.App.1976); *Jones v. Allen,* 473 S.W.2d 763, 766 (Mo.App.1971). The jury could consider the need for future medication for plaintiff's continuing pain as evidence of future medical expenses. The trial court did not abuse its discretion in refusing Instruction No. E.

■ Instruction No. F states:

The issue of plaintiff's future surgery is withdrawn from the case and you are not to consider such issue in arriving at your verdict.

There was evidence that plaintiff had been told he needed back surgery for a condition that predated the accident. Dr. Menchetti testified that the collision could have aggravated that condition, although what originally caused the condition was not known.

Defendant argues that Instruction No. F was required to avoid misleading the jury; that because there was evidence concerning a need for future surgery for a preexisting condition, a withdrawal instruction was needed to avoid raising a false issue. He argues further that a withdrawal instruction was required because of an abandonment of any claim of damages for future surgery.

Defendant relies on *Harris v. Washington,* 654 S.W.2d 303 (Mo.App.1983), as support for his claim that the trial court erred in not giving Instruction No. F. *Harris* was an action for personal injuries arising from an automobile accident. Ms. Harris complained of pain in her neck, shoulders and back. She was diagnosed with a cervical and lumbar strain and a strained shoulder. An X-ray of Ms. Harris disclosed a preexisting condition in her lower back area, the lumbar region. There was testimony that the collision caused the preexisting condition in Ms. Harris' lower back to become painful and symptomatic.

Ms. Harris underwent surgery for the back condition a year after her accident. The medical expenses that were admitted in evidence, over the objection of the defendant, included bills incurred as a result of that surgery. There was an earlier motion in limine in *Harris* directed to any evidence concerning the surgery, and at the close of the trial a withdrawal instruction directed to that evidence was submitted and refused. The trial court, however, granted a motion for new trial as to the issue of damages.

*Harris* explains:

The trial court granted the new trial on damages on the grounds that: (1) the court should have given defendant's offered withdrawal instruction, as the evidence failed to establish any causal connection between the hospitalization and the bills incurred and the accident; (2) the refused withdrawal instruction should have been given to clarify the issues in the jury's assessment of damages; (3) the verdict was excessive in that it must be presumed based in part on the improperly admitted evidence of the hospitalization and the bills incurred; and (4) that the court should have granted defendant's motion in limine and should have restricted any evidence from Dr. Kantor's deposition relative to the hospitalization as there was no causal relationship between the accident and the hospitalization.

654 S.W.2d at 306.

In *Harris* the court held the trial court did not abuse its authority in granting a new trial on the ground of excessiveness, concluding, "[W]e assume that the jury considered the evidence of the hospitalization and bills in assessing damages, and further, that such

evidence augmented the damages." *Id.* at 307.

There are similarities in *Harris* and this case. Both cases involved preexisting injuries that were aggravated by a cervical strain. However, there are differences as well. In *Harris* evidence concerning hospitalization and expenses related to surgery were admitted in evidence with respect to surgery that was not causally related to the accident. In this case there was no evidence admitted that related to expenses not related to the accident.

In closing argument plaintiff's attorney told the jury that in assessing damages it should consider plaintiff's past medical bills of $1,800, the fact that plaintiff will be on anti-inflammatory medication for the rest of his life, and his loss of leisure activities for the future. There was no mention of possible future surgery. There was nothing before the jury concerning expenses for surgery of any kind, particularly nothing as there was in *Harris,* concerning expenses incurred for surgery not causally related to the accident.

This court concludes that the facts in this case, insofar as issues to which a withdrawal instruction could be directed, are more akin to those in *Weisbach v. Vargas,* 656 S.W.2d 797 (Mo.App.1983), than to those in *Harris. Weisbach* involved lost earnings. The plaintiff there was off work at the time of the accident in question by reason of medical leave related to a diabetic condition. He testified that his medical leave "was up on the following Monday after the accident and that he intended to report back on that following Monday." *Id.* at 799. That information was incorrect. As *Weisbach* explains:

It developed on cross-examination, however, that the medical leave expired a month later, rather than the following Monday, and that the reason he did not return to his employment at Ford was his diabetic condition and his inability to work around gas fumes. There was no connection between the injuries received in the accident and his inability to return to his former job, and there was no loss of Ford wages which could be traced to the injuries received in the accident.

*Id.*

The defendant in *Weisbach* tendered a withdrawal instruction that the trial court refused. It read, "The issue of plaintiff, Richard Weisbach's claim for lost wages from Ford Motor Company from the date of the accident to the present date is withdrawn from the case and you [are] not to consider such evidence in arriving at your verdict." *Id. Weisbach* concluded, "The trial court . . . apparently believed that [Mr. Weisbach's] cross-examination testimony had 'straightened out' the false or misleading testimony given on direct examination, and that there was no reasonable likelihood that the jury would be in any way confused or misled by his direct examination testimony about the loss of Ford wages." *Id.* at 800. *Weisbach* held the trial court's refusal of the withdrawal instruction was not an abuse of discretion; that it was not reversible error.

This court's review of the record on appeal does not disclose any representation to the jury that plaintiff's two ruptured discs were attributable to the accident, nor that any recommended surgery was intended to address injuries caused by the accident. Here, as in *Weisbach,* the record does not disclose a reasonable likelihood that the jury was in any way confused or misled by the evidence concerning plaintiff's preexisting injury or any future expense that it might produce. There was no evidence concerning any amount of expense that would be produced by surgery to correct the ruptured discs.

Defendant's argument that plaintiff claimed damages for his back ailment, then abandoned that claim, is not supported by the record. The existence of the back injury, the ruptured discs, was pursued by defendant, not plaintiff. As plaintiff's attorney told the trial court:

Their defense is—there [sic] defense is [plaintiff's] neck was so bad that it needs surgery and it needed it before the accident because it was spinal stenosis and the osteophytes predated the accident.

. . .

You see, they got to put—they got to put all the evidence of surgery in just like they wanted for a pre-existing condition and now they want to withdraw it from the jury.

I never said the surgery was due to this collision. As a matter of fact, in Dr. Phelps' deposition—not Dr. Phelps, Dr. Menchetti, I said "Doctor, we know that the spinal stenosis and the osteophytes predate the accident."

Plaintiff's argument was sound. This court finds the trial court did not abuse its discretion in refusing Instruction No. F. Point III is denied.

Defendant's fourth allegation of error is directed to Instruction No. 8, plaintiff's damage instruction, patterned after MAI 4.01. Point IV argues the trial court erred in giving the instruction "without deleting the ... portion concerning damages [plaintiff] was 'reasonably certain to sustain in the future' because the issue of future surgery, medical expenses and wages were admittedly out of the case and no doctor could state that any permanent pain was attributable to injuries sustained as a result of the April 27, 1991 automobile accident."

Instruction No. 8 states:

If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe he sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.

The language in Instruction No. 8 about which defendant complains is proper if supported by the evidence. MAI 4.01, n. 4. As discussed with respect to the part of Point III relating to Instruction No. E, there was evidence from which the jury could find plaintiff sustained permanent injury. *See McPherson v. Bi–State Development Agency,* 702 S.W.2d 129, 131–32 (Mo.App.1985). Point IV is denied.

■ Defendant's fifth allegation of error contends the trial court erred in refusing Instructions No. B and I. He contends there was substantial evidence of comparative fault of plaintiff; that there was evidence the two

vehicles impacted in the street; that plaintiff had seen defendant's vehicle backing from his driveway before impact. Point V asserts that the instructions given to the jury mandating a 100% finding either for plaintiff or defendant unfairly prejudiced defendant.

The comparative fault instructions defendant tendered provide:

### Instruction No. I

In your verdict you must assess a percentage of fault to plaintiff, whether or not defendant was partly at fault, if you believe:

First, either:

plaintiff failed to yield the right-of-way, or

plaintiff knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of collision in time thereafter to have stopped, or swerved, or served [sic] and sounded a warning but plaintiff failed to do so, and

Second, plaintiff, in any one or more of the respects submitted in Paragraph First, was thereby negligent, and

Third, such negligence of plaintiff directly caused or directly contributed to cause any damage plaintiff may have sustained.

### Instruction No. B

The phrase "yield the right-of-way" as used in these instructions means a driver entering the roadway from a driveway is required to yield to another vehicle already on the roadway.

■ A disjunctive instruction requires evidence that supports each of its submissions. *Berra v. Union Electric Co.,* 803 S.W.2d 188, 190 (Mo.App.1991). Instruction No. I contains two submissions; (1) that plaintiff failed to yield the right-of-way (as that term is defined in Instruction No. B), and (2) that plaintiff knew or could have known by the use of the highest degree of care there was a reasonable likelihood of collision in time to have averted the collision by stopping, swerving or sounding a warning.

■ "It is error to give an instruction where there is no substantial evidence to

support the issue submitted." *McLeod v. Beloate*, 891 S.W.2d 476, 478 (Mo.App.1994). In *McLeod* the evidence adduced showed it had been physically impossible for the defendant to have had the right-of-way. *McLeod* held the trial court erred in submitting a comparative fault instruction that told the jury it could assess a percentage of fault to the plaintiff in that case upon finding defendant had the right-of-way when the accident occurred.

The first submission in Instruction No. I is that plaintiff failed to yield the right-of-way. In order to have failed to yield the right-of-way, according to the definition in Instruction No. B, plaintiff would have had to come into the roadway after defendant was already there.

Only one witness, defendant's wife, testified that the collision occurred in the roadway rather than in Mr. Ferguson's driveway. She did not testify, however, that plaintiff's pickup was moving when the collision occurred. Plaintiff testified the accident occurred as he prepared to back up; that he had his foot on the brake. He explained, "So I was more or less just sitting there waiting for [defendant] to clear the street behind me before I went to pull my truck into gear." Plaintiff told the jury what happened after defendant's pickup began moving:

Well, the first time I seen him coming, it didn't phase me because it was normal to see somebody get in their truck and just start backing up.

But after I'd said something to Herman [Ferguson], I looked back to see if he'd got out from behind me yet. And at that point he was already in the middle of the road, and was coming at me at a much higher rate of speed than I knew he was going to be able to stop the truck.

. . .

Well, I reached across to grab the kids because I knew that we were going to be hit, and just to keep them from being slammed into the dash because it's steel, and I just reached across to catch them from going forward when we got hit.

Plaintiff was asked, "And you did get hit?" He answered, "Yeah, we got hit."

Even if the jury believed Mrs. Craft's testimony that the collision occurred in the

roadway, the evidence was incompatible with a finding that defendant entered the roadway before plaintiff. There was no evidence to support the first submission in Instruction No. I. As in *McLeod*, it was not possible, under the facts in evidence, for defendant to have had the right-of-way. Thus, the jury could not have found plaintiff failed to yield the right-of-way to him.

Plaintiff testified he saw defendant's pickup coming across the street "at a much higher rate of speed than I knew he was going to be able to stop." He stated he reached across to catch the children in his pickup to keep them from being thrown into the dash of his truck. Defendant testified that from the time he looked in his rear view mirror and began backing out of his driveway the collision occurred in "[m]aybe a couple of seconds."

The evidence did not support the submission that plaintiff knew or could have known there was a reasonable likelihood of a collision, under the facts in evidence, to have averted the collision in each of the manners hypothesized in Instruction No. I. Point V is denied. The judgment is affirmed.

SHRUM and BARNEY, JJ., concur.