Herbert L. OWENS, individually, and Herbert L. Owens, as Parent and Next Friend of Makayla D. Owens, a minor child, Plaintiffs–Respondents,

v.

John DOUGHERTY, D.O., Defendant–Appellant.

No. 24439.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 20, 2002.

Jayson A. Ford, J. Michael Shaffer, and Charles H. Stitt, Kansas City, for Appellant.

Roger A. Johnson, Scott Gallagher and Scott Vorhees, Joplin, for Respondent.

PHILLIP R. GARRISON, Presiding Judge.

John Dougherty, D.O. ("Dr. Dougherty") appeals from a judgment entered on a jury verdict in favor of Herbert L. Owens ("Mr. Owens") individually, and as parent and next friend of Makayla D. Owens ("Makayla") (collectively referred to as "Plaintiffs"). The judgment arose from a wrongful death suit filed by Plaintiffs against several defendants, including Dr. Dougherty and Dr. Esther Wadley ("Dr. Wadley") claiming medical negligence in the treatment of Mary Jo Owens ("Decedent"), wife of Mr. Owens, and mother of Makayla. Plaintiffs settled their claims against all defendants, except Dr. Dougherty, prior to trial. The jury returned a verdict against Dr. Dougherty in the amount of $800,000. On this appeal, Dr. Dougherty relies, *inter alia*, on instructional error. For the reasons discussed below, we reverse and remand for a new trial.

Decedent was seen on several occasions in the emergency room of Freeman Hospital in Joplin, Missouri ("Freeman Hospital") complaining of coughing, green mucous, nausea, vomiting, diarrhea, and abdominal cramping. These visits began in December 1998, four days after she gave birth to Makayla, and continued until early February 1999. Decedent returned to Freeman Hospital on February 3, 1999, again complaining of continuing vomiting and diarrhea. Lab work was done during that visit, apparently for the first time since Decedent initially reported these problems. The results of the lab work indicated a potassium level of 2.1, which was considered so low as to constitute a "panic value." "Panic values" were described in the evidence as "results which are so far from normal, either low or high, they are life threatening if not attended to as soon as possible." Treatment by the emergency room physician included infusion of potassium, but the evidence indicated that the amount ordered was less than 4% of what she needed to replenish her potassium level. The emergency room physician also recommended that Decedent go to the Freeman Hospital Residents' Clinic ("Residents' Clinic") for follow-up care. Dr. Dougherty was in charge of the Residents' Clinic,

which was operated by Freeman Hospital and, as the name implies, was utilized to train resident physicians.

Decedent went to the Residents' Clinic on February 8, 1999, complaining of the same symptoms for which she had been seen in the emergency room, i.e., cramping after eating, nausea, vomiting and diarrhea. She initially was examined by Dr. Wadley, a resident physician functioning under the supervision of Dr. Dougherty. Dr. Dougherty and Dr. Wadley discussed a treatment plan for Decedent before she left the Residents' Clinic on February 8. That plan included Dr. Dougherty telling Dr. Wadley to have Decedent go to the Freeman Hospital lab to have blood drawn, but he did not specify that she should do so immediately. The written order for the blood tests issued by Dr. Wadley was over the signature of Dr. Dougherty. Decedent was told to come back to the Residents' Clinic in one week, or to call sooner if she continued having problems. Decedent did not go to the lab for the blood tests until February 10, 1999. The results of those tests indicated a potassium level of 2.2, still considered to be a "panic value." [1]

The lab technician at Freeman Hospital testified that, although the lab requisition form presented by Decedent to the lab had the Residents' Clinic's name on it, only Dr. Dougherty's name appeared on the order form given to the lab technician. The lab technician testified that she obtained the results of the lab test, including the "panic value" for potassium, at 10:59 A.M. on February 10. She testified that she tried to call Dr. Dougherty's "office" with the results, but got an answering machine that said that no one would be in the office until 12:00. She then "faxed the report to the office." The lab technician did not get a "fax verification sheet" saying the fax was sent and received, because the lab's fax machine "does not give that." She did, however, get a report from the fax machine that the fax was "complete." The evidence was less than clear, but indicated that Dr. Dougherty's private office was separate from the Residents' Clinic. The lab technician made no attempt to call the Residents' Clinic or to fax the lab results to that location, despite the fact that the requisition form calling for the lab tests included the Residents' Clinic's phone number.

The evidence indicated that, at the time Decedent was still in the Residents' Clinic on February 8, Dr. Dougherty knew the results of the lab tests done on February 3. It also indicated that he did not know of the results of the February 10 lab tests between that date and February 13, when Decedent died of cardiac arrhythmia. In fact, Dr. Dougherty did not know of the February 10 lab test results until Mr. Owens came into the Residents' Clinic on February 15 (after Decedent's death) and asked for copies of Decedent's records. Dr. Dougherty testified that he then went to the computer and got the lab results after discovering that none were contained in the chart.

There was evidence that Decedent's dangerously low potassium level was a treatable condition until her death on February 13, 1999. Dr. Dougherty's attorney admitted, and other evidence indicated, that Decedent had hypokalemia (potassium depletion) on the date of her death, and that this condition caused or contributed to cause her death from cardiac arrhythmia.

---

**1.** There was evidence that Dr. Wadley told Decedent on February 8 to go to the hospital for the lab tests, but because she was told that the labs should be taken after she fasted, Decedent did not do so until February 10.

One of Dr. Dougherty's contentions on this appeal is that the trial court erred in giving a withdrawal instruction. That instruction was:

The issue of any alleged negligence of any health care provider besides [Dr. Dougherty] and [Dr. Wadley] contributing to or causing the death of [Decedent] is withdrawn from the case and you are not to consider such issue in arriving at your verdict.

Dr. Dougherty contends that this instruction was erroneously given "because [it] withdrew issues relevant to [his] defense, in that there was substantial evidence that the conduct of other health-care providers (together with the physiologic susceptibility of decedent) was the sole legal and proximate cause of Decedent's death."

The Committee's General Comment to withdrawal instructions, MAI 34.01 (2002 6th ed.)[2] provides that a withdrawal instruction is only to be given when, during the course of the trial, a false issue, improper evidence, or evidence of an abandoned issue has been injected. The decision of whether to give a withdrawal instruction is discretionary with the trial court, and an abuse of that discretion occurs only when the trial court's ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration. *Stevens v. Craft*, 956 S.W.2d 351, 355 (Mo.App. S.D.1997).

Dr. Dougherty argues that he was entitled to, and did, present evidence advancing a different explanation of the sole, rather than contributing, cause of Decedent's death. He cites *Earll v. Consolidated Aluminum Corp.*, 714 S.W.2d 932, 935 (Mo.App. E.D.1986), in support of his contention that he was entitled to have the jury consider evidence that others were the sole cause of Decedent's death. Consistent with this is *Oldaker v. Peters*, 817 S.W.2d 245, 253 (Mo. banc 1991), holding that a defendant may introduce and argue evidence that the acts of one other than the defendant were the sole cause of the decedent's death. *See also Whisenand v. McCord*, 996 S.W.2d 528, 531 (Mo.App. W.D.1999), where the court said that "both as a matter of law and as a matter of logic, evidence that a third party caused the injury may be relevant and necessary to the jury's determination of the negligence and causation issues." The court also said:

A party is entitled to argue all the evidence presented for the determination by the jury. The evidence of the defendant may be purely negative (non-negligence of the defendant) or affirmative (another's negligence was the cause of the injury). All of the evidence is for the jury to determine, and unless the defendant's evidence shows him to be negligent as a matter of law, the issues are for the jury.

*Id.* (quoting *Hoehn v. Hampton*, 483 S.W.2d 403, 409 (Mo.App. E.D.1972)).

In support of his contention, Dr. Dougherty notes that expert testimony presented by both sides established that other health care providers involved in the care and treatment of Decedent breached the applicable standard of care. For instance, Dr. Shane Bennoch testified that two of the emergency room doctors who treated Decedent before she went to the Resident's Clinic violated the applicable standard of care, as did the lab technician who breached her duty to make personal contact with the physician concerning the "panic value" from the lab tests. Dr. Paul Bronston, another of Plaintiffs' experts, testified that three of the emergency room doctors, as

---

**2.** The comment referred to herein is identical     to the one in effect at the time of trial.

well as the lab technician, violated the standard of care in treating Decedent, and that their negligence caused or contributed to cause Decedent's death. Finally, Dr. Nachman Brautbar, another expert called by Plaintiffs, testified that the acts or omissions of two of the emergency room physicians violated the standard of care and caused or contributed to cause Decedent's death. In addition to this testimony, Dr. Dougherty's expert, Dr. Robert Mannino, testified that the lab technician violated the standard of care in not communicating the panic potassium levels directly to him, and that such failure caused or contributed to cause Decedent's death. He, as well as another of Plaintiffs' experts, Dr. John Yanos, testified that the treatment given Decedent by Dr. Dougherty and Dr. Wadley did not violate the applicable standard of care, nor did it cause or contribute to cause Decedent's death. Instead, Dr. Mannino said that the lab technician's breach of the standard of care caused or contributed to cause Decedent's death.

Plaintiffs submitted the withdrawal instruction in question, saying that they did so in light of Dr. Dougherty's indication that no apportionment would be requested. Dr. Dougherty's attorney objected to the instruction, arguing, in part, that the fact that the negligence of other health care providers was "not an issue in the case, an ultimate issue, as to whether or not any of these health care providers are liable, the testimony and the evidence in this case from plaintiffs' experts are there were a number of people who deviated from the standard of care and that their deviation caused or contributed to cause the death. Now, while the issue might be that the jury needs to decide is whether or not Dr. Dougherty did or failed to do something which caused death, certainly they're entitled to take into consideration all the evidence."

The trial court gave the instruction, but in doing so, said that he was nevertheless going to permit argument concerning "whoever else was negligent." In closing argument, Dr. Dougherty's counsel argued, without objection, that the lab technician, and not Dr. Dougherty, was responsible for Decedent's death. Plaintiffs' counsel then argued that Dr. Dougherty's attorney essentially had accused the lab technician of causing Decedent's death by her failure to act, but that the withdrawal instruction given by the trial court was the law and they, the jury, had sworn to uphold the law. He explained that despite the fact that "half of the argument that [Dr. Dougherty's attorney] had up here was about how other health care providers had done wrong," the withdrawal instruction meant that any issue of any alleged negligence by anyone other than Dr. Dougherty and Dr. Wadley was withdrawn, "[i]n other words, it's no longer an issue." He also argued that the same was true concerning whether anyone else's negligence caused or contributed to cause Decedent's death. He concluded that under the withdrawal instruction, "[i]f you follow your duty as Dr. Dougherty should have followed his duty, then this whole issue that he spent so much time on over the last week is no longer an issue for you."

Plaintiffs' attack this point on several grounds. One of their arguments is that Dr. Dougherty and his counsel admitted that no other health care provider was at fault. They point to the instruction conference, when the trial court said that its view of the withdrawal instruction "as to anyone besides [Dr.] Dougherty, [Dr.] Wadley and Freeman [Hospital] is that from Dr. Dougherty's point of view there was no negligence on the part of those folks." The response of Dr. Dougherty's attorney was that "[f]rom Dr. Dougherty's

evidence that is correct, but not from Plaintiff's evidence." The following then occurred:

THE COURT: Well, that's why I guess I must admit to a little bit of confusion. It seems to me that you're entitled to argue that these experts have cast blame on—

[DR. DOUGHERTY'S ATTORNEY]: Whoever.

THE COURT:—A,B,C,D, and your client. The issue of their negligence, it seems to me, may not be a part of this lawsuit against your man, because your man doesn't claim they're negligent. What he's claiming is he's not negligent. And the issue in this lawsuit is did Dr. Dougherty neglect to do something.

These statements, relied on by Plaintiffs' counsel at the instruction conference, were largely those of the trial court, not Dr. Dougherty's attorney. Moreover, they specifically excluded Freeman Hospital (and, therefore, the lab technician, who was its employee) from their scope.

■ Plaintiffs also point out that Dr. Dougherty's attorney said to the trial court, in discussing the withdrawal instruction, that "it's not an issue in the case, an ultimate issue, as to whether or not any of these health care providers are liable," contending that this was an admission that the other health care providers were not negligent. However, to assert that there was no "ultimate issue" concerning whether the other providers were "liable," followed by a reminder that there was evidence that a number of them had deviated from the standard of care and caused or contributed to cause Decedent's death, does not constitute an admission that they were not negligent or did not cause the death. It was merely a statement that there was no "ultimate issue" as to whether the other providers were "liable," i.e., there was no issue to be submitted to the jury as to their liability. This was not an admission that would foreclose an argument that the other providers were the sole cause of Decedent's death.

■ Plaintiffs' also argue that Dr. Dougherty's attorney admitted in open court that the lab technician did nothing to cause Decedent's death. They point to a colloquy between Dr. Dougherty's attorney and the lab technician on redirect examination, wherein Dr. Dougherty's attorney said, "[J]ust so we're clear about something; I'm not saying or we're not saying you caused this lady's death and we know you did the best you can [sic], didn't you?" Plaintiffs contend that this statement constituted a judicial admission that the lab technician had not caused Decedent's death and that she had done the best she could; therefore, it was not error to withdraw any issue of the lab technician having been negligent or causing Decedent's death.

■ Plaintiffs cite *Hyatt Corp. v. Occidental Fire & Cas. Co. of N.C.*, 801 S.W.2d 382, 390–91 (Mo.App. W.D.1990), for the proposition that an unequivocal admission by a party's counsel judicially estops that party from taking a contrary position. A true judicial admission is one made in court or preparatory to trial by a party or his attorney that concedes, for the purposes of that particular trial, the truth of some alleged fact so that one party need offer no evidence to prove it, and the other party ordinarily is not allowed to disprove it. *Mitchell Eng. Div. of CECO v. Summit Realty*, 647 S.W.2d 130, 140–41 (Mo.App. W.D.1982). It removes the proposition in question from the field of disputed issues in the case in which it is made, and is a substitute for evidence in the sense that it does away with the need for evidence on that subject in that cause. *Id.*

In *Piel v. Piel*, 918 S.W.2d 373 (Mo.App. E.D.1996), the appellant argued that the respondent had judicially admitted an issue that was contrary to the judgment entered by the trial court. In holding that the admission referred to was not binding on the respondent, the court noted that there was subsequent testimony contrary to the alleged admission, that the appellant had not objected to evidence that was contrary to the alleged admission, that appellant did not argue at trial that there had been a judicial admission, and that appellant's own testimony indicated that the subject of the alleged admission remained an issue. *Id.* at 375. In support of its refusal to consider the matter judicially admitted, the court cited *Vaughn v. Michelin Tire Corp.*, 756 S.W.2d 548, 557 (Mo. App. S.D.1988), for the proposition that when a party does not rely on the judicial admissions of an adversary, and introduces evidence that has the effect of proving the admission, the party making the admission is not bound thereby. *Piel* at 376.

The statement by Dr. Dougherty's attorney during the redirect examination of the lab technician, even if viewed as a judicial admission that the defense was not contending that she caused Decedent's death, was immediately followed by questions establishing that the lab technician had violated the procedures established by the Hospital in communicating "panic" lab values to the physicians, along with an admission that Dr. Dougherty could not satisfy his obligation to the patient unless the lab technician had satisfied hers. It was also followed by two of Dr. Dougherty's experts who testified that the lab technician's negligence in not contacting Dr. Dougherty directly with the panic lab values had been the cause of Decedent's death. All of that was without objection from Plaintiffs.

Plaintiffs did not argue to the trial court that the comment by Dr. Dougherty's attorney in examining the lab technician amounted to a judicial admission. Plaintiffs' counsel also alluded to the evidence concerning the lab technician in closing argument, and Dr. Dougherty's attorney argued in closing, without objection, that the evidence demonstrated that the death was caused by the lab technician. Plaintiffs' counsel then argued that the withdrawal instruction meant that the alleged negligence of any other health care provider was no longer an issue for the jury's consideration. He argued that "it shouldn't have been an issue anyway" because of the statement made by Dr. Dougherty's attorney in examining the lab technician. In other words, Plaintiffs' counsel argued the facts to the jury, and did not contend to the trial court that the statements, as a matter of law, were judicial admissions. On these facts, the statement by Dr. Dougherty's attorney to the lab technician did not result in a binding judicial admission.

■ Plaintiffs also argue that "any other person's negligence absolutely ceased to be an issue" when Dr. Dougherty did not seek apportionment of fault.[3] This argument is unavailing. As explained in *Oldaker v. Peters*, 817 S.W.2d at 252–53, there is a distinction between sole cause and apportionment of fault. There, the Missouri Supreme Court said, "The issue . . . is not apportionment, but the alleged negligence of [the defendant]. Defendant may introduce any evidence that tends to establish that she is not guilty of the negligence charged." Dr. Dougherty's failure to seek apportionment does not amount to an abandonment of the right to contend that the negligence of someone else, even a

---

**3.** At the time of trial, the only parties remaining in the lawsuit were Plaintiffs and Dr. Dougherty, as Plaintiffs had settled with the other defendants originally named in the suit.

non-party, was the sole cause of the incident in question.

◼ Finally, Plaintiffs contend that, even if the trial court erred in giving the withdrawal instruction in question, it was not reversible error because of the "[p]owerful," substantial evidence of Dr. Dougherty's negligence. They point out that the jury found that Dr. Dougherty was negligent in spite of his "ongoing skillful efforts to distract and mislead the jury's focus to uncontested and abandoned issues."

While there was evidence to support a submission of Dr. Dougherty's negligence, Dr. Dougherty had the right to have the jury consider the evidence and his contention that the negligence of others was the sole cause of Decedent's death. The trial court, by giving the withdrawal instruction in question, instructed the jury that they should not consider any issue of the negligence of health care providers other than Dr. Dougherty and Dr. Wadley "causing" or contributing to cause Decedent's death. Inexplicably, however, the trial court announced that, notwithstanding the fact that it was giving that instruction, it would permit Dr. Dougherty to argue in closing "whoever else was negligent as testified to by any of the plaintiffs' witnesses." After Dr. Dougherty's attorney argued that the lab technician was the cause of Decedent's death, Plaintiffs' attorney argued specifically that, because of the withdrawal instruction, that matter was no longer an issue that the jury was allowed to consider. He also reminded the jury that they had sworn to uphold the law, and that "[i]f you follow your duty as Dr. Dougherty should have followed his duty, then this whole issue that [Dr. Dougherty's attorney] spent so much time on over the last week is no longer an issue for you."

Because of the withdrawal instruction given by the trial court, the relative strength of the evidence against Dr.

Dougherty is beside the point. The unavoidable fact remains that the jury was specifically instructed not to consider an issue that Dr. Dougherty had a right to have considered. Even though Dr. Dougherty's attorney argued that, under the evidence, negligence of the lab technician was the sole cause of Decedent's death, the withdrawal instruction directed that the jury not consider such issue, and it was used to remind the jury that their consideration of such evidence would be contrary to the oath they had taken to uphold the law.

We are convinced that the trial court erred in giving the withdrawal instruction in question, and that Dr. Dougherty was prejudiced thereby. For that reason, we must reverse the judgment and remand the case to the trial court for a new trial. Because of this result, we need not address the other issues raised by Dr. Dougherty on this appeal.

PARRISH, J., and RAHMEYER, J., concur.