70 A.3d 397

Enzo MARTINEZ, a minor, by and through his parents and next friends, Rebecca FIELDING and Enso Martinez, et al.

v.

THE JOHNS HOPKINS HOSPITAL.

No. 1394, Sept. Term, 2012.

Court of Special Appeals of Maryland.

July 3, 2013.

636

James M. Nichols & Byron L. Warnken (Warnken, LLC, Towson, MD, Gary Wais, Keith D. Forman, Wais, Vogelstein, & Arfaa, Pikesville, MD), on the brief for Appellant.

Donald L. DeVries, Jr. & Derek M. Stikeleather (Janet A. Forero, Meghan H. Yanacek, Goodell, DeVries, Leech & Dann, LLP, Baltimore, MD), on the brief for Appellee.

Panel: EYLER, DEBORAH S., GRAEFF, BERGER, JJ.*

## BERGER, J.

This case involves a medical malpractice action filed in the Circuit Court for Baltimore City. Appellant and cross-appellee, Enzo Martinez ("Martinez"), a minor, by and through his parents,[1] alleged that appellee and cross-appellant, The Johns Hopkins Hospital ("the Hospital"), negligently failed to perform a timely Caesarean section, causing Martinez to suffer from cerebral palsy, retardation, and other disorders.

After a two week trial, a jury awarded Martinez $4 million for lost wages, $25 million for future medical expenses, and $26 million for non-economic damages. The court entered judgment in favor of Martinez in the amount of $55 million. Thereafter, the Hospital filed a motion for new trial, to alter or amend judgment, and for remittitur. The trial court denied the Hospital's request for a new trial. The trial court further reduced the jury's award for lost wages from $4 million to $2,621,825, and reduced the jury's $26 million award for non-economic damages to $680,000.[2] Martinez filed a notice of appeal on September 18, 2012. The Hospital filed a cross-appeal on September 19, 2012.

Martinez presents one question for review, which we have rephrased as follows:

1. Whether the circuit court erred by reducing the jury's non-economic damages award on the basis that Maryland's cap on non-economic damages is unconstitutional because it violates the separation of powers doctrine under the Maryland Declaration of Rights.

---

* Judge Douglas R.M. Nazarian did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8–605.1.

1. Martinez's mother and father will be referred to as "Ms. Fielding" and "Mr. Fielding," respectively. Martinez and his parents will be collectively referred to as "Martinez."

2. The trial court left intact the jury's $25 million award for future medical expenses.

The Hospital presents four questions for review, which we have reordered and rephrased as follows:

1. Whether the circuit court abused its discretion by precluding evidence regarding the standard of care applicable to nurse-midwives, and a midwife's breach of that standard of care while treating Ms. Fielding.

2. Whether the circuit court abused its discretion by admitting evidence that Ms. Fielding was never offered general anesthesia.

3. Whether there was sufficient evidence to support a jury award of $25 million for Martinez's future medical expenses.

4. Whether the circuit court abused its discretion by declining to annuitize the jury award.

For the reasons set forth below, we hold that the circuit court erred in precluding evidence of the nurse-midwife standard of care, and in precluding evidence of a breach of that standard of care by a nurse-midwife while treating Ms. Fielding. Accordingly, we reverse the judgment of the Circuit Court for Baltimore City and remand for further proceedings. For guidance on remand, we shall also address whether the circuit court erred in admitting evidence regarding the offering of general anesthesia.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 25, 2010, Ms. Fielding began labor with her first child, Martinez. Ms. Fielding elected to have a natural birth at home, with the assistance of Evelyn Muhlhan, a registered nurse midwife ("Midwife Muhlhan"), and a doula.[3]

Ms. Fielding (who was 10 days overdue) was in labor for 14.5 hours during the first stage of labor, and at least five hours more in the second stage of labor.[4] The position of the

---

3. A doula is a labor "coach" who provides support for a woman in labor.

4. The first stage of labor is when contractions occur until the mother's cervix becomes dilated at ten centimeters wide. The second stage of

baby was occiput posterior.[5] This means that the baby's head was down; however, unlike the usual presentation, he was facing forward instead of inward, toward Ms. Fielding's spine.[6] At 12:30 a.m., Midwife Muhlhan attempted to expedite delivery while at Ms. Fielding's home. First, Midwife Muhlhan applied fundal pressure [7] to Ms. Fielding two or three times. Second, Midwife Muhlhan injected Ms. Fielding multiple times with Pitocin, a hormone that increases the strength and frequency of contractions. Third, misjudging the state of her labor, Ms. Muhlhan performed an episiotomy, which is a procedure performed upon immediate delivery in which the perineum is cut in order to enlarge the vaginal opening. Finally, Ms. Muhlhan directed Ms. Fielding to cleanse herself with a probiotic treatment, as an alternative to taking antibiotics, in order to prevent the potentially fatal transmission of Group B streptococcus bacteria (for which Ms. Fielding had tested positive), to the baby during labor and delivery. After providing these treatments, Midwife Muhlhan "decided it was time to go to the hospital." Midwife Muhlhan sutured the episiotomy and called an ambulance.

Ms. Fielding arrived at the Hospital at 3:30 a.m. on March 26, 2010. Ms. Fielding was an unknown patient to the Hospital. The Hospital's labor and delivery team evaluated Ms. Fielding's status and the best way to deliver her baby. The team also applied a fetal heart rate monitor. The medical

---

labor is referred to as the "pushing stage," and occurs when the cervix is fully dilated and ends when the baby is delivered. The third stage of labor is the delivery of the placenta.

5. The occiput posterior fetal position ("OP") occurs when the baby enters the pelvis facing forward, with his back towards the mother's back.

6. This presentation often leads to the baby not being able to progress through the birth canal. The position of the baby's head prevents him from tucking his chin in, and therefore, the width of the head, given its angle, is larger *vis a vis* the mother's pelvic bones than it would otherwise be.

7. The application of fundal pressure essentially involved pushing on Ms. Fielding's belly in an attempt to push the child through the birth canal.

records indicate that the descent level of the baby was assessed as +1 station[8] when Ms. Fielding arrived at the Hospital. The baby remained at +1 after they gave Ms. Fielding a chance to push a few times.[9]

At 3:45 a.m., Dr. Christopher Ennen, the treating physician, and Dr. Sherrine Ibrahim, the attending senior resident physician, determined that Ms. Fielding would be unable to deliver Martinez vaginally. Rather, the Hospital's physicians concluded that an "urgent" Caesarean section was required.[10] The Hospital's physicians determined that an "emergency" Caesarean section was not required because the fetal heart rate monitor indicated that the fetus was being adequately oxygenated.[11]

---

8. The "stations" range from −5 to +5, and denote the position of the baby. For example, at −5 station, the baby's head is not engaged and the baby is "floating" outside the cervix. At 0 station, the baby's head is even with a certain part of the mother's pelvic bones. At +5 station, the baby's head crowns and then emerges from the vagina.

9. We observe that an episiotomy is generally performed when a baby is +5 station. As noted above, Midwife Muhlhan performed an episiotomy before sending Ms. Fielding to the Hospital. However, it seems highly unlikely that the baby could have been at a +5 station when the episiotomy was performed. To be sure, the baby was assessed as a +1 station when Ms. Fielding arrived at the Hospital, and remained at a +1 station after pushing several times.

10. Expert witnesses testified at trial that "urgent" Caesarean sections must be completed "as soon as you can" but that there is time to "[d]o it in a safe manner." Patients undergo blood testing prior to an urgent Caesarean section, which is a prerequisite for administering spinal anesthesia or epidural anesthesia. Spinal or epidural anesthesia involves "put[ting] a needle in [the patient's] back." Experts testified that this procedure is considered the safest method of administering anesthesia during a Caesarean section. The urgent Caesarean section is performed once the blood tests have been completed and the patient is cleared for anesthesia. By contrast, an "emergency" Caesarean section must be completed "immediately." No blood tests are administered, and patients are given general anesthesia. General anesthesia is a faster method of putting a patient "under" using a "tube" and "gas." However, general anesthesia presents an increased risk of mortality to pregnant women.

11. The status of the fetal heart rate was disputed at trial. Martinez contended that the fetal heart monitor demonstrated that Martinez's heartbeat had become non-reassuring by 4:00 a.m.

The Hospital team took Ms. Fielding's medical history and drew blood for laboratory testing. The blood tests were sent to the Hospital's laboratory on a "stat" basis, meaning they were the "highest" priority and should be completed "as quickly as possible." The Hospital explained at trial that the blood testing was necessary in order to determine whether it would be safe to administer spinal/epidural anesthesia to Ms. Fielding during the Caesarean section procedure. The Hospital also administered IV penicillin to Ms. Fielding to reduce the risk of passing her Group B streptococcus bacteria on to Martinez. Further, the Hospital obtained Ms. Fielding's consent for spinal/epidural anesthesia, administered medications to reduce the strength of Ms. Fielding's contractions, and made other pre-delivery preparations.

Some of the laboratory test results were returned at 3:57 a.m. The tests showed a negative result for syphilis. At 4:14 a.m., the Hospital re-ordered the remaining blood tests, which related to Ms. Fielding's blood type and platelet count.[12] The remaining laboratory test results were returned at 4:52 a.m. The Hospital determined that, based upon the test results, it would be safe to use spinal/epidural anesthesia for Ms. Fielding's Caesarean section. The anesthesia was administered and Ms. Fielding was prepared for surgery. At 4:57 a.m., the Hospital transported Ms. Fielding to the operating room. Martinez was delivered at 5:40 a.m., and his condition at birth was poor. He now suffers from cerebral palsy, retardation, and other disorders.

Martinez, by and through his parents, filed a complaint alleging that the Hospital negligently failed to perform a timely Caesarean section. In short, Martinez argued that "had [Martinez] been delivered by 4:15 a.m., as the standard of care required, he would not have suffered any injury." Further, Martinez argued at trial that the Hospital also "fail[ed] to recognize ominous signs of fetal distress." Mar-

---

12. The Hospital alleged that it had to re-order blood tests because Ms. Fielding prevented nurses from obtaining sufficient blood samples. *See infra,* footnote 13.

tinez contended that the Hospital should have converted to an emergency Caesarean section based on the status of Martinez's fetal heart rate monitor. Accordingly, Martinez concluded that the Hospital was also negligent in performing an urgent Caesarean section, rather than an emergency Caesarean section.

The Hospital argued that Midwife Muhlhan was solely responsible for Martinez's injuries, and, therefore, that Martinez's injuries "occurred a number of hours prior to the delivery and prior to the arrival at Johns Hopkins." Additionally, the Hospital argued that the timing in performing the urgent Caesarean section was medically necessary in order to evaluate the effects of Midwife Muhlhan's treatment on Ms. Fielding. The Hospital posited that the delay in receiving blood tests was due, in part, to Ms. Fielding's lack of cooperation.[13] Finally, the Hospital maintained that an emergency Caesarean section was not required because the fetal heart rate monitor indicated that the fetus was being adequately oxygenated.

After a two week trial, a jury awarded Martinez $4 million for lost wages, $25 million for future medical expenses, and $26 million for non-economic damages. The court entered judgment in favor of Martinez in the amount of $55 million. Thereafter, the Hospital filed a motion for new trial, to alter or amend judgment, and for remittitur. After a two day hearing, the trial court denied the Hospital's request for a new trial, and reduced the jury's award for lost wages from $4

13. The Hospital's witnesses testified that Ms. Fielding did not want a Caesarean section, that they had difficulty obtaining Ms. Fielding's medical history, and that Ms. Fielding was removing necessary medical devices. Further, the Hospital's witnesses testified that Ms. Fielding interfered with its ability to complete her blood work, because she told caregivers, "don't touch me," when they attempted to draw her blood. Moreover, once nurses began to draw Ms. Fielding's blood, the Hospital claimed that Ms. Fielding refused to stay still, which prevented the nurse from obtaining a sufficient blood sample. The insufficient sample allegedly required a second test, which added to the delay. In short, the Hospital contended that Ms. Fielding was "very uncooperative, combative, resisting, and making management generally more difficult."

million to $2,621,825. The trial court further ruled that the Maryland cap on non-economic damages ("the Cap") was constitutional, and reduced the jury's $26 million award for non-economic damages to $680,000 in accordance with the Cap. Martinez noted this timely appeal, and the Hospital also noted its timely cross-appeal on the following day. Additional facts relevant to the issues on appeal are summarized below.

## A. Motion *in Limine*

Martinez filed a pre-trial motion *in limine* seeking to exclude testimony regarding the standard of care applicable to Midwife Muhlhan, and Midwife Muhlhan's alleged breach of that standard of care while treating Ms. Fielding. The Hospital filed an extensive response, arguing that the midwife standard of care, and Midwife Muhlhan's breach of that standard of care, were relevant to the Hospital's defense. The Hospital's theory was that the Hospital was not negligent, nor was it a cause of any injury to Martinez. Rather, the Hospital contended, the injury was solely caused by Midwife Muhlhan's negligence before Ms. Fielding ever arrived at the Hospital.

In support of its opposition to the motion *in limine*, the Hospital attached an order from the Maryland Board of Nursing ("the Board"), which suspended Midwife Muhlhan's certification and license to practice as a nurse-midwife. The order provided that the Board had never authorized Midwife Muhlhan to perform home deliveries, and concluded that Midwife Muhlhan had violated the Nurse Practice Act ("NPA") based upon the care that she provided to Ms. Fielding and other patients. In particular, as to the care rendered to Ms. Fielding, the Board found that:

> [Midwife Muhlhan] violated the NPA during her care of [Ms. Fielding] for reasons including, but not limited to, the following:
>
> i. Practicing as a CRNM in a home delivery setting without an approved Agreement that includes home births and practicing without a collaborating physician for homebirths.

ii. Lack of documentation, including labor and delivery records and fetal monitoring strips, regarding the patient's intra-partum course.

iii. Failing to treat the patient's GBS per Center for Disease Control guidelines and lack of documentation that the patient declined and understood the risks of declining antibiotics.

iv. Performing an episiotomy when the baby's head was not crowning and the baby was at +1 station.

v. Administering Pitocin intramuscularly to augment labor and failing to document any fetal monitoring after administration.

vi. Using or directing the use of fundal pressure, which is not considered an acceptable practice to hasten vaginal delivery.

Accordingly, as a result of the treatment that Midwife Muhlhan provided to Ms. Fielding and four other individuals, the Board suspended Midwife Muhlhan's certification and license to practice as a nurse-midwife.[14] The Board took emergency action to suspend Midwife Muhlhan's license on the basis that "the public health, safety or welfare imperatively require[d] emergency action[.]"

Additionally, the Hospital attached to its response to the motion *in limine* an excerpt from Dr. Katz's deposition. Dr. Katz determined that when Ms. Fielding arrived at the Hospital, there was evidence of "uterine tetany" due to the Pitocin administered by Midwife Muhlhan. Dr. Katz explained that, as a result, there was no relaxation in between contractions. Relaxation between contractions is important, Dr. Katz testified, because this is when "there is re-establishment of blood flow and there is proper oxygen exchange." By contrast, Dr. Katz stated that "[w]hen you have lack of relaxation, there is no opportunity for exchange to happen[,] or less opportunity, and that can very adversely affect fetal oxygen status." Dr.

---

**14.** The Hospital further alleged that subsequent to Midwife Muhlhan's initial suspension, the Board amended the suspension order to reflect a sixth case, which resulted in the death of an infant.

Katz concluded that because of the Pitocin injections administered by Midwife Muhlhan, there was an "absence of oxygen [to Martinez which] is what ultimately caused damage."

Dr. Katz further observed in his deposition testimony that Martinez had "cephalic hematoma, which cannot be explained except by trauma ... and the cause of that, of course, is the trying to force a head that was in a unique form through a narrow pelvis [15] ... [and by] try[ing] to force it with oxytocin, excessive stimulation or by pushing on the fundus or by exposing it to five hours of second stage [labor] when it's not making progress." Further, Dr. Katz explained that:

[The] baby's head [was] in occipital-posterior being banged against a pelvis for several hours with somebody pushing on the top of the baby trying to push it out between the labia, so much so to deform it that reportedly it was crowning [16] .... And then [the baby went] all the way back up, not being delivered successfully ...

Based upon this treatment, Dr. Katz concluded that injury was caused to Martinez "during those times when [Midwife Muhlhan was] hitting and beating up on this baby."

Finally, Dr. Katz's deposition testimony provided that fundal pressure is no longer used in labor and deliveries, and that applying fundal pressuring during the second stage of labor in these circumstances constituted a breach of the standard of care.

After holding a hearing, the trial court granted Martinez's motion *in limine*, ruling that, "[t]here cannot be testimony as to what the standard of care is for midwives or that this was a breach of the standard of care...." In support of its ruling, the trial court explained:

---

15. The record reflects that there was cephalopelvic disproportion ("CPD"); namely, the head was not making it through the area of the pelvic bones.

16. "Crowning" refers to when the baby's head has passed through the birth canal, and the top of the head, or "crown," remains visible at the vaginal opening.

.... The issue here is the standard of care, whether or not, Hopkins breached the standard of care and whether that conduct caused [the injuries].

\* \* \*

Not somebody else's breach of a standard of care. Not somebody else's negligence. [The Hospital's] conduct [is what is relevant], because if [Midwife Muhlhan] breached the standard of care [but] caused no damage, then it's totally irrelevant.... [or it could be that] she didn't breach the standard of care, [but] caused the damage....

\* \* \*

... if you have testimony as far as causation. You have testimony that fundal pressure was applied at home, before she came to Hopkins, and if you have causation testimony.... [t]hen why do you have to tell the jury that—and that is a breach of standard of care, that's negligence to do that.

\* \* \*

I just—I'm concerned about the potential prejudice from the jury feeling there is a third-party here, who is not a party to the action.

Accordingly, the trial court concluded that, as to Midwife Muhlhan's conduct, only evidence regarding causation was relevant. The trial court, therefore, limited the Hospital to presenting evidence of: (1) the physical actions and conduct of Midwife Muhlhan; and (2) the reactions of the Hospital personnel when learning of this conduct.

## B. Testimony Regarding Midwife Muhlhan

The following is a summary of the relevant testimony introduced at trial regarding the treatments used by Midwife Muhlhan.

### i. Midwife Muhlhan's Use of Pitocin

The Hospital asked its treating physician, Dr. Ennen, about his reaction when he learned that Ms. Fielding was given "two

to three injections intramuscular, or IM injections, of Pitocin at home." Dr. Ennen replied that his reactions were "[s]urprise and shock." Dr. Ennen then explained that "Pitocin is something that we use in the hospital through an IV to—in very carefully monitored doses to cause uterine contractions to be more frequent and/or stronger. It's never, in my experience that I know of, used as injections in the muscle in a non-monitored situation to cause labor to progress."

The Hospital also offered testimony from Ms. Naomi Cross ("Nurse Cross"), the nurse primarily responsible for Ms. Fielding's nursing care. However, upon Martinez's objection, the trial court precluded Nurse Cross from giving her first-hand account of how Midwife Muhlhan's actions affected her management of Ms. Fielding, or her experience with Pitocin. The trial judge did not elaborate on the basis for precluding this testimony.[17]

The Hospital's expert witness, Dr. Katz, provided the following opinion on Midwife Muhlhan's use of Pitocin:

The Pitocin further aggravated the ability of the fetus to deal with the circumstances presented to it. And that was after the huge dose of Pitocin was given.

When asked to clarify what he meant by a "huge dose," Dr. Katz explained:

I assume that even if I take the lowest potential measurable dose that one can give by injection, it is 1,000 fold more than what you give in a hospital.... The concentration of Pitocin in the vial that is available commercially is one unit per milliliter. To give the jury an idea of what a milliliter is, we have in a small tablespoon—correction, in a small teaspoon, we have about five milliliter. That will be approximately five units or 50,000 milliunits. In that little teaspoon. We in the hospital give usually one, two, five or 10 milliunits, not

---

**17.** The record reflects that Martinez argued that this testimony was not relevant, and that Nurse Cross was not qualified to provide the testimony because she was not a physician. However, the questions asked of Nurse Cross were factual and not asked to elicit expert testimony.

thousands of milliunits. So you have an aurea difference here, even with the smallest syringe.

Martinez's expert witness, Dr. Balducci, also addressed the use of Pitocin:

What I perceive here is the midwife had given a shot of IM or sub-q Pitocin. . . . And it sounds like they gave one milliunit, which is a very small dose, to enhance the contractions.

The following exchange ensued during Dr. Balducci's cross-examination:

Q: And the bottom line is that if you have that overstimulation situation [from use of Pitocin], it can cause lack of perfusion to the baby, and, therefore, lack of oxygen to the baby; is that correct?

A: That could occur.

Q: Can result in a severe lack of oxygen and, ultimately, neurological injury if it persisted?

A: That's correct.

Q: Okay. You would agree that and understand why the Hopkins personnel were shocked or surprised, whatever word you want to use, when they got a history that she had two or three doses of IM Pitocin? You would agree with that, wouldn't you?

A: I don't know if I'd be shocked. I mean, I think the midwives—

Q: Surprised? Can we agree on surprised?

A: Well, I think I've seen midwives use this before in delivery centers, but they use small doses. They don't—I still, to this day, don't know what the dose was. I'm understanding the midwife said it was 1—

The trial judge sustained the Hospital's objection to Dr. Balducci's last comment and instructed the jury to disregard the statement. The Hospital's counsel then asked:

Q: You would understand if the Hopkins personnel were surprised when she reported a history of the different doses of IM Pitocin?

A: Yeah, surprised.

Q: Okay. And that's because you're not aware of any physicians that are using that approach?

A: No, sir.

\* \* \*

Q: And you don't know if it was a minute or two later [when Midwife Muhlhan checked the fetal heart rate]. We just don't know—

A: Well, that's the way midwives will practice. If they hear 100, they'll turn her, and they'll recheck.

The trial court sustained the Hospital's objection to the last statement by Dr. Balducci.

Martinez's expert witness, Dr. Stokes, provided the following testimony regarding the use of Pitocin:

Q: You're [sic] never given I–N [sic] Pitocin during the second stage of labor.

A: I have not.

Q: And you're not familiar with any obstetrician giving I–N [sic] Pitocin in second stage labor, are you?

A: Not in recent years, but certainly, it was done in the past.

Q: You're not familiar with any literature that advocates the use of I–N [sic] Pitocin during the second stage of labor, are you?

A: I'm not familiar with any literature in the OB/GYN. No.

Q: . . . . You're not going to administer Pitocin except in a hospital setting with IV drip that you can control and constant electronic fetal monitoring to be able to observe and check the status of the fetus; is that correct, sir?

A: That's the way obstetricians do it. It's not the way midwives do it.

Upon the Hospital's objection, the trial court then instructed the jury to disregard Dr. Stokes' last statement:

THE COURT: All right. Ladies and gentlemen, you're to disregard the comment about what midwives do or don't do. That's not an issue in this case.

### ii. Midwife Muhlhan's Use of Fundal Pressure

One of the Hospital's witnesses, Dr. Lauren Krill, testified that, "[a]s a second year resident, like I said, I didn't realize that fundal pressure is something that somebody would actually do." Dr. Ibrahim, a resident physician at the Hospital, testified that Mr. Fielding told her he was "uncomfortable with some of the things that were going on at home. And he demonstrated to me that the—someone had used fundal pressure with two hands pushing on his wife's chest." Finally, the Hospital's obstetrical expert witness, Dr. Katz, testified that, "Yes, I think fundal pressure under these circumstances plays a role [in Martinez's injury]. . . ."

On the other hand, however, the trial court stopped Dr. Katz from testifying the instant he uttered the word "deviation" when referring to Midwife Muhlhan's care:

Q: When did, is it your opinion, with that hypothetical I gave you, that the injury occurred.

A: Yes, it happened during the pushing phase of Mrs. Fielding, when the contractions were associated with substantial deviations and—

THE COURT: Stop.

Martinez's expert witnesses testified as follows on cross-examination regarding the use of fundal pressure:

A: Forceful fundal pressure with contractions is not something I would do. But the bottom line here is it didn't make any difference.

\*   \*   \*

Q: Okay, okay. Because fundal pressure tends to do more harm than good, I think your words?

A: I've seen ribs being broken. You can rupture a uterus. So we don't do it anymore.

## C. Testimony Regarding the Hospital's Offering of General Anesthesia

The following is a summary of the relevant testimony regarding whether the Hospital "offered" Ms. Fielding general anesthesia as an alternative to other forms of anesthesia.

Martinez's counsel asked its first obstetrical expert witness, Dr. James Balducci, whether the Hospital "ever offered [Ms. Fielding] general anesthesia." The Hospital objected, and the trial court initially overruled the objection. The Hospital explained to the trial judge that the objection was due to the fact that Martinez had not alleged a claim founded upon informed consent. Thereafter, the trial court sustained the objection.

Martinez's second obstetrical expert witness, Dr. Richard Stokes, was asked whether Ms. Fielding's medical records indicated that she should not receive general anesthesia. Dr. Stokes interjected that the "option [of general anesthesia] was never offered to the patient." Additionally, Dr. Stokes testified that the Hospital "did not offer the option of being put to sleep, which would have gotten her baby out a whole lot sooner."

When Ms. Fielding testified, Martinez's counsel asked whether she was "ever given a choice between general anesthesia versus a combined spinal-epidural." The Hospital objected, and the trial court overruled the objection. Thereafter, Ms. Fielding testified: "No. I was never given that option." In a subsequent bench conference, the Hospital again explained its argument regarding informed consent. The following colloquy ensued:

THE COURT: There won't be an argument. There won't be an argument about informed consent.

[MARTINEZ'S COUNSEL]: No.

[THE HOSPITAL'S COUNSEL]: I just wanted to make sure that you understood there was [a] reason [for the objection].

THE COURT: No. I kind of wondered what it was. Now I understand.

[MARTINEZ'S COUNSEL]: No. We don't have a count for it. Right. . . . General negligence.

THE COURT: Right.

Finally, during Martinez's cross-examination of the Hospital's obstetrical expert, Dr. Michael Katz, Martinez's counsel asked: "[W]as Ms. Fielding, the patient, ever given the choice of which anesthesia?" The Hospital's objection was overruled. Dr. Katz testified: "I don't believe she was given, or should have been given [the choice of which anesthesia]." [18]

In closing argument, Martinez's counsel stated that the Hospital "could have converted to general anesthesia at any time they wanted[.]" Moreover, Martinez's counsel explained: "They want to say, oh my God, the risks. It's a one percent risk. There is a risk for anything." Martinez's counsel further stated during closing argument:

> You're supposedly the number one hospital in the world, but can't get blood for an hour and 14 minutes, and is now too intimidated to use general anesthesia with a one percent risk? Ask any mother in that situation. . . .

> What would any mother, any reasonable mother in that circumstance do? We've got nine women on this jury. You all know what you would do. You would say give me the general anesthesia. . . . She wasn't even given the option because they were just going to wait.

The Hospital did not object to Martinez's closing arguments. The jury was instructed on general negligence, and was not instructed on informed consent.

## D.   Motion for New Trial

The trial court held a post-trial hearing on the Hospital's motion for new trial, to alter or amend judgment, and for

---

18. The Hospital also points out that on direct examination, Dr. Katz testified that general anesthesia was too risky and not appropriate for Ms. Fielding.

remittitur. The trial court considered various issues, including the preclusion of evidence regarding the midwife standard of care, the admission of evidence regarding the Hospital's offering of anesthesia to Ms. Fielding, the sufficiency of the evidence to support the jury verdict, and the Hospital's request to annuitize the jury award. Ultimately, the trial court rejected each of the Hospital's arguments.

In considering the first issue, the trial court ruled that the exclusion of midwife standard of care evidence did not deny the Hospital a fair trial. In particular, the trial judge observed:

> [T]he defense was not prevented and did, in fact, present evidence that the midwife's conduct was dangerous under the circumstances, why it was dangerous under the circumstances that it caused the damages, and how it caused the damages. Defense was free to vigorously argue that the midwife's conduct was the proximate cause.
>
> They were, however, prevented from characterizing the conduct as "negligent." Telling the jury that a nonparty is negligent as opposed to how the conduct affected what happened to the plaintiff would have been prejudicial and not relevant to the case.

Regarding the second issue, the trial judge observed that the testimony regarding whether general anesthesia was "offered" would "not be admissible if it goes to informed consent." The trial judge, however, ruled that the challenged evidence was admissible to show that Ms. Fielding had not refused general anesthesia:

> On the issue of informed consent, the defense presented evidence that the mother was very uncooperative, combative, resisting, and making management generally, more difficult of her. The challenged evidence was therefore not admitted as an informed consent issue, but it was relevant to show that they were not waiting for blood work because of the mother's refusal or anything that the mother did.

The trial judge also recognized that Martinez's closing argument was improper and "exceed[ed] the directions that I had

given from the bench on the issue of informed consent." The trial judge, nevertheless, pointed out that the Hospital did not object to Martinez's closing argument. Accordingly, the trial judge explained that, "had an objection been made, I was prepared to sustain the objection and give a curative instruction to the jury." Accordingly, the trial court denied the Hospital's motion for a new trial.

## I. MARTINEZ'S APPEAL

### STANDARD OF REVIEW

"Evaluating the constitutionality of an act of the Maryland General Assembly is a question of law[,]" as is "the interpretation of the Constitution and the Maryland Declaration of Rights." *DRD Pool Serv., Inc. v. Freed,* 416 Md. 46, 62, 5 A.3d 45 (2010). The Court of Special Appeals, however, "has no discretion but to follow the law as enunciated by the Court of Appeals." *Freed v. DRD Pool Serv., Inc.,* 186 Md.App. 477, 481, 974 A.2d 978 (2009), *aff'd sub nom.,* 416 Md. 46, 5 A.3d 45 (2010).

### DISCUSSION

### Constitutionality of the Maryland Cap on Non–Economic Damages

Martinez argues that the Maryland cap on non-economic damages ("the Cap") is unconstitutional because it violates the separation of powers doctrine under the Maryland Declaration of Rights. Martinez, therefore, contends that the jury award for non-economic damages should not have been reduced from $26 million to $680,000. The Hospital posits that it is well settled under Maryland law that the Cap is constitutional. We hold that the constitutionality of the Maryland cap on non-economic damages is moot in light of our finding that a new trial is warranted pursuant to the Hospital's cross-appeal.[19]

---

**19.** *See infra,* Part II. Nevertheless, it is well settled that the Cap is constitutional. The Court of Appeals has consistently upheld the consti-

## II. THE HOSPITAL'S CROSS-APPEAL

### STANDARD OF REVIEW

Evidentiary rulings will not be disturbed "absent error or a clear abuse of discretion." *Thomas v. State*, 429 Md. 85, 97, 55 A.3d 10 (2012) (citations omitted). "[A]ll relevant evidence is admissible. Evidence that is not relevant is not admissible." Md. Rule 5–402. Further, the Maryland Rules provide that:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Md. Rule 5–403.

When determinations of relevancy are "the ultimate issue," appellate courts are "generally loath to reverse a trial court[.]" *Tyner v. State*, 417 Md. 611, 616–17, 11 A.3d 824 (2011) (citations omitted). The trial court's consideration of prejudice or confusion of the issues "will be accorded every reasonable presumption of correctness...." *Cure v. State*, 421 Md. 300, 331, 26 A.3d 899 (2011) (citations omitted). Thus, an

---

tutionality of the Cap, explaining that it has become "embedded in the bedrock of Maryland law." *DRD Pool*, 416 Md. at 68, 5 A.3d 45. *See also Oaks v. Connors*, 339 Md. 24, 37, 660 A.2d 423 (1995) (holding that *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992) "expressly rejected [the] constitutional argument[ ]" that the Cap "infringes upon [the] right to a jury trial ... and we reaffirm that decision today"); *Murphy*, 325 Md. at 366, 601 A.2d 102 (holding that "the limitation upon recoverable noneconomic tort damages under [the Cap] ... does not amount to a restriction upon access to the courts"). Based upon the Court of Appeals' decisions upholding the Cap, we have previously rejected the same separation of powers argument advanced by Martinez. *See, e.g., Edmonds v. Murphy*, 83 Md.App. 133, 150, 573 A.2d 853 (1990), *aff'd sub nom.*, 325 Md. 342, 601 A.2d 102 (1992) ("[W]e hold that [the Cap] does not violate the separation of powers doctrine embodied in Article 8."); *Univ. of Md. Med. Sys. Corp. v. Malory*, 143 Md.App. 327, 355, 795 A.2d 107 (2001) ("[W]e were presented with [the constitutionality of the Cap under a separation of powers analysis] in *Murphy* and ... our holding in that case is controlling."); *Owens–Corning v. Walatka*, 125 Md.App. 313, 335–37, 725 A.2d 579 (1999), *abrogated on other grounds by John Crane, Inc. v. Scribner*, 369 Md. 369, 800 A.2d 727 (2002) (same).

abuse of discretion exists when the "decision under consideration [is] well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *North v. North,* 102 Md.App. 1, 14, 648 A.2d 1025 (1994). "Trial judges do not, however, have discretion to admit irrelevant evidence." *Schneider v. Little,* 206 Md.App. 414, 447, 49 A.3d 333 (2012), *cert. granted,* 429 Md. 303, 55 A.3d 906 (2012) (citing *State v. Simms,* 420 Md. 705, 724, 25 A.3d 144 (2011)).

## DISCUSSION

### A. Exclusion of Evidence Regarding the Midwife Standard of Care and the Granting of Martinez's Motion *in Limine*

■ The Hospital argues that the trial court erred by precluding evidence of the midwife standard of care and Midwife Muhlhan's alleged breach of the applicable standard of care. Martinez posits that this argument is not preserved for appellate review, and, regardless, the trial court properly excluded the evidence in question. In particular, Martinez argues that the trial court's resolution of the motion *in limine* was not "clearly intended to be the final word on the matter" because the court did not "instruct [the Hospital] . . . not to proffer the evidence again during trial." We agree with the Hospital that this issue is preserved for our review because the trial court made a final ruling on the motion *in limine.* We further hold that the trial court erred by excluding evidence of the midwife standard of care, and Midwife Muhlhan's breach of that standard of care while treating Ms. Fielding.[20] This error denied the Hospital a fair trial.

### i. Waiver

■ When a trial court makes a final ruling on a motion *in limine* to exclude evidence, a party is not required to proffer

---

20. For clarity, we observe that the evidence relevant to the Hospital's defense is evidence of any material breach of the midwife standard of care that caused or contributed to Martinez's injuries.

the excluded evidence at trial in order to preserve its issue for appeal. *See, e.g., Reed v. State,* 353 Md. 628, 638, 728 A.2d 195 (1999) ("When motions *in limine* to exclude evidence are granted, normally no further objection is required to preserve the issue for appellate review.") (citations omitted); *J.L. Matthews, Inc. v. Md. Nat'l Capital Park and Planning Comm'n,* 368 Md. 71, 106 n. 29, 792 A.2d 288 (2002) ("It is well-established that after the judge's preclusion of the evidence [on a motion *in limine* ], Petitioner was not required to proffer that evidence at trial."); *Prout v. State,* 311 Md. 348, 356–57, 535 A.2d 445 (1988), *superseded by rule on other grounds,* Md. Rule 1–502, *as recognized in Beales v. State,* 329 Md. 263, 269, 619 A.2d 105 (1993) (holding that when a trial judge determines that "questionable evidence will *not* be admitted ... the proponent of the evidence is left with nothing to do at trial but follow the court's instructions"); *Simmons v. State,* 313 Md. 33, 38, 542 A.2d 1258 (1988) (holding that after a final ruling to preclude evidence on a motion *in limine,* requiring a defendant "to offer the evidence again during the trial in order to preserve the issue for appellate review is unwarranted and would unduly interfere with the orderly progression of the trial"); *Davis v. Petito,* 197 Md.App. 487, 505, 14 A.3d 692 (2011), *rev'd on other grounds,* 425 Md. 191, 39 A.3d 96 (2012) (holding that a party "was not obligated to make a proffer once the court had finally ruled on her motion *in limine* ").

By contrast, when a ruling on a motion *in limine* is not final, the party wishing to raise the issue on appeal must make a timely proffer at trial. *Prout,* 311 Md. at 356–57, 535 A.2d 445. Several cases have addressed whether a ruling on a motion *in limine* is final. *See, e.g., id.* at 356–57, 535 A.2d 445 (ruling on a motion *in limine* is final where "the trial judge resolves the[ ] motions *[in limine]* by clearly determining that the questionable evidence will *not* be admitted, and by instructing counsel not to proffer the evidence again during trial. . . ."); *Simmons,* 313 Md. at 38, 542 A.2d 1258 (citing *Prout,* 311 Md. at 358, 535 A.2d 445) (ruling on a motion *in limine* is final when the trial judge has "directed defense

counsel to avoid raising the issue during his cross-examination of the witness"); *id.* at 38, 535 A.2d 445 (holding that a trial court's ruling on a motion *in limine* was a final ruling when "[t]he trial judge unconditionally ruled that he would not 'let anybody tell this jury what this man's thought processes are' ").

Based upon our review of the record, we conclude that the trial court's ruling constituted a final ruling on the motion *in limine.* The trial judge granted Martinez's motion *in limine,* and expressly stated that "[t]here cannot be testimony as to what the standard of care is for midwives or that this was a breach of the standard of care.... " Martinez points out that the ruling was not final because the trial court stated it would reconsider if "Plaintiff's witnesses[ ] open the door." However, the trial judge's "opening the door" caveat was raised only due to a question by Martinez's counsel seeking clarification of the ruling:

[MARTINEZ'S COUNSEL]: [The Hospital's counsel] are not permitted to create opening the door [ ] themselves on cross, correct?

THE COURT: Right. I mean, you may open it through cross examination.

[MARTINEZ'S COUNSEL]: Right. I understand. But they can't ask the question directly?

THE COURT: Correct.

The Hospital's counsel then asked for further clarification. Counsel gave examples of what they could ask during cross-examination, but noted that they could not ask, "is it a violation of standard of care?" The trial judge replied, "[c]orrect."

In sum, just as in *Prout,* the trial judge determined that the evidence at issue would not be admitted. Similarly, as in *Simmons,* the trial court directed defense counsel to avoid raising the issue during cross-examination. Accordingly, the trial judge made a final ruling on the motion *in limine,* and the Hospital was left with nothing to do at trial but follow the

court's instructions. We, therefore, hold that the issue is preserved for our review.

## ii. Relevancy of Midwife Standard of Care

We now turn to the substantive question whether the Hospital was properly precluded from presenting evidence of the midwife standard of care, or Midwife Muhlhan's breach of that standard of care while treating Ms. Fielding. The Hospital argues that the midwife standard of care testimony was relevant for two reasons. First, the testimony was relevant to the Hospital's defense that Midwife Muhlhan's negligence solely caused Martinez's brain damage before Ms. Fielding ever arrived at the Hospital, and, therefore, the Hospital was not a cause of injury. The Hospital argues that this is because "[n]egligent and grossly negligent medical treatment . . . is much more likely to cause injury than non-negligent medical treatment." Second, the Hospital contends, it was relevant to explaining why the Caesarean section took place when it did. The Hospital alleged that it had to undertake additional evaluations to determine the effect of the Midwife's negligence on the fetus and the mother before performing the Caesarean section.[21]

Martinez argues that the trial court did not err because the Hospital's causation defense was not contingent upon a finding that Midwife Muhlhan violated the standard of care. Rather, if the jury were to find that Midwife Muhlhan was "the sole cause of [Martinez's] injuries, the jury was obligated to find for the Hospital regardless of whether her conduct was negligent or completely innocent." Accordingly, Martinez concludes that the standard of care testimony was irrelevant, and the trial judge did not err in precluding the testimony. On the record before us, we hold that the evidence of the midwife standard of care, and Midwife Muhlhan's breach of that stan-

---

**21.** The parties also argue at length whether the "door was opened" at trial for the Hospital to present standard of care evidence regarding the midwife. Because we hold that the standard of care evidence was independently relevant, we need not address this alternative theory of admissibility.

dard of care material to causing Martinez's injury, is relevant to the Hospital's defense that it was not negligent and not a cause of injury.[22]

The trial court limited the Hospital to presenting evidence of: (1) the physical actions and conduct of Midwife Muhlhan; and (2) the Hospital's immediate reactions when learning of this conduct.[23] The trial judge precluded any evidence that Midwife Muhlhan's midwifery did not meet the applicable standard of care, or that Midwife Muhlhan's actions were negligent. In making its ruling, the trial judge observed:

> Not somebody else's breach of a standard of care. Not somebody else's negligence. [The Hospital's] conduct [is what is relevant], because if [Midwife Muhlhan] beached the standard of care [but] caused no damage, then it's totally irrelevant.... [or it could be that] she didn't breach the standard of care, [but] caused the damage....

We begin by examining the rationale employed by the trial court. First, the trial judge determined that the standard of care evidence was not relevant because Midwife Muhlhan's breach of her standard of care would not excuse the Hospital's breach of its standard of care. Critically, this rationale necessarily presumes that the Hospital breached its standard of care. The Hospital's defense, however, was that it was not negligent, and did not cause any injury to Martinez. Second, the trial judge observed that Midwife Muhlhan could have breached her standard of care but caused no damage, or caused damage without breaching the standard of care. In either case, the trial judge reasoned that the standard of care

---

22. In light of our holding that the evidence is admissible because it is relevant to the Hospital's complete denial of liability, we need not address whether the precluded evidence was relevant to the Hospital's explanation for the timing of the Caesarean section. We also observe that this argument was not briefed in detail by the parties. Although this alternative relevancy argument is raised in the Hospital's brief, both parties focus primarily on the relevancy of the evidence to the Hospital's complete denial of liability.

23. *See* Factual and Procedural Background, *supra,* regarding a detailed synopsis of the testimony at trial.

related to the midwife would be irrelevant. While the trial judge's inferences are reasonable, his rationale does not recognize the other obvious possibility; namely, that Midwife Muhlhan breached her standard of care, and that the breach was the sole cause of Martinez's injuries. This was precisely the defense advanced by the Hospital at trial. Thus, the relevant inquiry on appeal is whether evidence of a non-party's negligence is relevant to a defendant's complete denial of liability.

Maryland courts have seemingly not decided whether a party may defend itself with evidence of a non-party's negligence. Courts in other jurisdictions, however, have considered the issue related to a non-party's negligence, and have deemed such evidence admissible. *See, e.g., Jefferson v. Lyon Sheet Metal Works,* 376 S.W.3d 37, 45 (Mo.Ct.App.2012), *reh'g and/or transfer denied* (June 28, 2012) ("The trial court erred in prohibiting [defendant] from presenting its defense and advocating [third party's] negligence at trial."); *Owens v. Dougherty,* 84 S.W.3d 542, 548–49 (Mo.Ct.App.2002) ("[Defendant has] ... the right to contend that the negligence of someone else, even a non-party, was the sole cause of the incident in question."); *Archambault v. Soneco/Ne., Inc.,* 287 Conn. 20, 40–41, 946 A.2d 839 (2008) (holding that defendant "is entitled to a new trial" because "a defendant may introduce evidence of a nonparty employer's negligence as the *sole* proximate cause of the plaintiff's injuries under a general denial"); *Straley v. United States,* 887 F.Supp. 728, 743 (D.N.J.1995) ("Defendants will be allowed to introduce evidence of [non-party's] negligence in an effort to prove that it was the sole proximate cause of [plaintiff's] injuries. As stated above, however, unless the jury determines that his negligence bears a 100% causal relationship to the injuries, the issue of supervening causation will be destroyed and his negligence will cease to be relevant.") (applying New Jersey law); *Fabian v. Minster Machine Co., Inc.,* 258 N.J.Super. 261, 276, 609 A.2d 487 (App.Div.1992) (citing *Brown v. United States Stove Co.,* 98 N.J. 155, 171, 484 A.2d 1234 (1984)) ("An 'empty chair defense' is not improper...."); *Mengwasser v. Anthony Kempker Trucking, Inc.,* 312 S.W.3d 368, 375 (Mo.

Ct.App.2010), *as modified* (Apr. 27, 2010) ("[Defendant] argued that [it] was not at fault at all, and, in support of that argument, it was entitled to submit proof that any other person's negligence, even that of a settling third party, proximately caused the accident."); *Wojcik v. City of Chicago*, 299 Ill.App.3d 964, 971, 234 Ill.Dec. 137, 702 N.E.2d 303 (1998) (quoting *Leonardi v. Loyola Univ. of Chicago*, 168 Ill.2d 83, 101, 212 Ill.Dec. 968, 658 N.E.2d 450 (1995)) ("A defendant has the right not only to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, but also has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries."); *Krklus v. Stanley*, 359 Ill.App.3d 471, 493, 295 Ill.Dec. 746, 833 N.E.2d 952 (2005) (quoting *Leonardi*, 168 Ill.2d at 101, 212 Ill.Dec. 968, 658 N.E.2d 450) (same); *Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007) ("[W]hen the evidence is sufficient to raise a jury question as to whether a defendant's or a third person's negligence proximately caused or proximately contributed to a plaintiff's injuries, then a trial court must inform the jury that the plaintiff is entitled to recover damages, if any, from the defendant if the jury finds that the defendant is guilty of negligence which solely or in concurrence with a third person proximately caused or contributed to the plaintiff's injuries.").

■ Moreover, these cases support our analysis that evidence of both negligence and causation attributable to a non-party is relevant where a defendant asserts a complete denial of liability. *See, e.g., Jefferson*, 376 S.W.3d at 44 (citing *Mengwasser*, 312 S.W.3d at 372–73) ("[A] defendant may introduce evidence and argue that a third person, even a non-party, caused a plaintiff's injuries.... [because] evidence that the [non-party] was negligent *and* that her actions caused the accident.... [i]s both legally and logically relevant....") (emphasis added); *McDonnell v. McPartlin*, 192 Ill.2d 505, 522, 249 Ill.Dec. 636, 736 N.E.2d 1074 (2000) ("[N]egligent conduct and proximate cause are distinct, albeit related, concepts. Given their relationships, there is a pronounced tendency

when considering one to include the other."); *id.* at 525, 249 Ill.Dec. 636, 736 N.E.2d 1074 ("[A] reasonable inference could be made that [non-party] Dr. Ahstrom was professionally negligent, *and* that such negligence was the sole proximate cause of plaintiff's claimed injury. Accordingly, defendants were entitled to make this argument to the jury.") (emphasis added); *Petre v. Kucich,* 356 Ill.App.3d 57, 66–67, 291 Ill.Dec. 867, 824 N.E.2d 1117 (2005) (remanding for new trial and holding that "defendants will again be allowed to assert an empty chair defense and admit evidence of the [dismissed parties'] alleged postoperative negligence on the issue of proximate cause"). *See also Leonardi v. Loyola Univ. of Chicago,* 262 Ill.App.3d 411, 415–16, 199 Ill.Dec. 13, 633 N.E.2d 809 (1993), *aff'd,* 168 Ill.2d 83, 212 Ill.Dec. 968, 658 N.E.2d 450 (1995) ("[T]he trial court properly permitted defendant to question other doctors concerning [non-party] Dr. Tierney's duties and responsibilities.").

The Connecticut Supreme Court aptly explained the rationale for holding that evidence of negligence of a non-party is relevant to a defendant's complete denial of liability:

> [A] defendant is entitled to try to convince the jury that not only did it *not* cause [the] plaintiff's injuries, but someone else *did.* A void of evidence concerning the [non-party]'s conduct would leave a logical hiatus in the story presented to the jury. With no one allowed to show what part the [non-party's] conduct played, the jury would be left to wonder whether anyone other than the defendant *could* have caused [the] plaintiff's injuries. Thus, the defendant . . . was entitled to show that the [non-party's] negligence was the sole proximate cause of the plaintiff's injuries.

*Archambault,* 287 Conn. at 32–33, 946 A.2d 839.

■ We are persuaded by the logical and well-reasoned rationale of our sister jurisdictions. Here, the Hospital was entitled to try to convince the jury that not only was it *not* negligent and *not* the cause of Martinez's injuries, but that Midwife Muhlhan *was* negligent and *did* cause the injuries. There was a void of evidence that left a logical hiatus in the

story because the jury was not allowed to hear what role Midwife Muhlhan's conduct played. This void was amplified by the fact that this was a medical malpractice case involving obstetrical medicine and treatment decisions. The Hospital's defense was contingent upon showing that Midwife Muhlhan's use of intra-muscular Pitocin injections, fundal pressure, and/or attempting home delivery after 41 gestational weeks solely caused Martinez's injuries. Surely it was far from self-evident to the lay jury whether this treatment caused injury.[24] Accordingly, because the Hospital was precluded from presenting any evidence that Midwife Muhlhan breached the standard of care and was therefore negligent, it follows that the jury was left to wonder whether anyone other than the Hospital—the sole defendant—*could* have caused Martinez's injuries.

For these reasons, we hold that evidence of the midwife standard of care, and Midwife Muhlhan's breach of that standard of care, if any, during her treatment of Ms. Fielding, were relevant to the Hospital's defense. The trial judge, therefore, erred in precluding this evidence. *See* Md. Rule 5–402; *Schneider, supra,* 206 Md.App. at 447, 49 A.3d 333 (citing *Simms, supra,* 420 Md. at 724, 25 A.3d 144) ("Trial judges do not, however, have discretion to admit irrelevant evidence."). By precluding such evidence, the jury was given a materially incomplete picture of the facts, which denied the Hospital a fair trial.

### a. Impact of Midwife Muhlhan's Status as a Non–Party

■ Martinez asserts several arguments against our reliance on other jurisdictions in reaching our holding. First, Martinez contends that the cases addressing evidence of a nonparty's negligence are distinguishable because the Hospital is merely seeking to "avoid responsibility for its strategic decision not to add [Midwife] Muhlhan as a third-party defen-

---

24. *See also infra,* Part C(iv), discussing the further amplification of this void in light of Martinez's arguments at trial that Midwife Muhlhan's treatment was appropriate.

dant." The Hospital, in turn, alleges that Martinez chose not to name Midwife Muhlhan as a defendant because she was uninsured, and, therefore "judgment-proof." We hold that the reasons for not joining an individual as a defendant have no bearing on the legal issue of the admissibility of evidence of a non-party's negligence.

The Connecticut Supreme Court has held that the reasons for not joining a party as a defendant have "no bearing on the legal issue before this court, namely, whether a defendant may introduce evidence of a nonparty employer's negligence as the sole proximate cause of the plaintiff's injuries under a general denial." *Archambault*, 287 Conn. at 41, 946 A.2d 839. In that case, a plaintiff argued that evidence of a non-party's negligence should have been excluded because the defendant "could have attempted to keep [the non-party] in the case. . . . [and] could have filed an apportionment complaint against [the non-party] following [the non-party's] dismissal from the case rather than attempting to proceed under a general denial to adduce evidence of [the non-party's] alleged negligence." *Id.* at 40, 946 A.2d 839. Moreover, the plaintiff pointed out that the defendant "instituted a postverdict indemnification claim against [the non-party] pursuant to which the trial court awarded [defendant] a prejudgment remedy in the amount of $8,590,000. . . ." *Id.* The Connecticut Supreme Court, however, rejected these claims, observing:

> We are unpersuaded. The fact that [defendant] could have taken other actions to compel [the non-party's] continued involvement in the case, which may or may not have been appropriate or effective, has no bearing on the legal issue before this court, namely, whether a defendant may introduce evidence of a nonparty employer's negligence as the sole proximate cause of the plaintiff's injuries under a general denial. The fact that [defendant] instituted an indemnification claim against [the nonparty] similarly has no bearing on the issue before this court. We therefore conclude that the plaintiff's arguments have no merit and that [defendant] is entitled to a new trial.

*Id.* at 40–41, 946 A.2d 839. *See also supra,* discussing cases from other jurisdictions that have addressed the "empty chair" defense without regard as to why an individual was not a party to the action.

We are persuaded by the rationale of our sister jurisdictions, and hold that the parties' reasons for not joining Midwife Muhlhan as a defendant have no bearing on the evidentiary issue presented.

### b. Impact of Contributory Negligence Doctrine

Martinez also argues that the cases we rely on from other jurisdictions are inapposite because those jurisdictions have adopted comparative negligence, whereas Maryland follows a system of contributory negligence. Accordingly, Martinez argues that evidence relating to Midwife Muhlhan's negligence, or lack thereof, did not make it any more or less likely that the Hospital was negligent, nor did it make it any more or less likely that the Hospital caused Martinez's injuries. The Hospital contends that such a distinction is of no consequence because, although the cases cited originated in comparative negligence jurisdictions, the cases "address[ed] sole proximate causation defense[s] in contexts where apportionment is completely irrelevant." We are not persuaded by Martinez's argument. Critically, the cases we rely on from comparative negligence jurisdictions involved actions in which the principles of comparative negligence expressly did not apply. Moreover, the cases all address actions where, as here, a defendant asserted a complete denial of liability.

Under a system of comparative negligence, "[c]onsideration of the negligence of both parties and non-parties to an action is essential for determining liability commensurate with degree of total fault." *Bofman v. Material Serv. Corp.,* 125 Ill.App.3d 1053, 1064, 81 Ill.Dec. 262, 466 N.E.2d 1064 (1984). In states that have adopted comparative negligence, apportioning of liability is permitted as to each tortfeasor's "proportionate share of the injury suffered." *Archambault,* 946 A.2d at 854–55 (internal citation omitted).

■ By contrast, Maryland allows a plaintiff to secure "complete relief" from a single defendant tortfeasor, who remains jointly and severally liable with all other defendant tortfeasors for the whole of any negligently caused injuries. *See, e.g., Service Transport Inc. v. Hurricane Exp., Inc.*, 185 Md.App. 25, 39–40, 968 A.2d 620, *cert. denied,* 409 Md. 49, 972 A.2d 862 (2009).[25] The question for the jury is simply whether the defendant was "a" cause of injury. *See* Maryland Pattern Jury Instructions, MPJI–Cv 19.10 (2003) ("For the plaintiff to recover damages, the defendant's negligence must be a cause of the plaintiff's injury."). "The fact that another individual also tortiously contributes to the plaintiff's injury does not alter the independent, concurring tortfeasor's responsibility for the entirety of the injury which he or she actually and proximately caused." *Consumer Protection Division v. Morgan,* 387 Md. 125, 182, 874 A.2d 919 (2005) (quoting *Woods v. Cole,* 181 Ill.2d 512, 519, 230 Ill.Dec. 204, 693 N.E.2d 333 (1998)).

First, we observe that although the cases cited originated in comparative negligence jurisdictions, comparative negligence principles did not apply in many of the cases. For example, under New Jersey's comparative negligence system, assessment of liability is limited to those who are parties to a suit. *Straley,* 887 F.Supp. at 742. Accordingly, in New Jersey, a non-party's "negligence cannot be considered by the jury on the issue of comparative negligence." *Id.* For this reason, in *Straley,* because an alleged joint tortfeasor was not a party to the suit, the non-party's "negligence [could] not be considered by the jury on the issue of comparative negligence." *Id.* Indeed, the *Straley* court acknowledged that, " 'there is a considerable difference between having the jury assess and determine [defendants'] percentage of negligence [as com-

---

**25.** Martinez also argues that he suffered a single indivisible injury, and therefore the Hospital remained jointly and severally liable for its negligence even if Midwife Muhlhan was also negligent and contributed to Martinez's injuries. *See Morgan,* 387 Md. at 179–80, 874 A.2d 919 (discussing the "single injury rule" and joint and several liability amongst tortfeasors).

pared to a non-party] and the defendants arguing [the non-party's] negligence as the [sole] cause of the accident.' " *Id.* Accordingly, the court held that the evidence of the non-party's negligence was admissible because it was relevant to the defendant's complete denial of liability. *Id.* at 734.

In the other cases we cited *supra*, apportionment of fault was not implicated because the defendants chose to assert a defense of complete denial of liability rather than filing a statutory claim for apportionment. In those cases, because the defense was that a non-party's "negligence was the sole proximate cause of the plaintiff's injuries so as to escape liability altogether.... the legal principles of apportionment set forth in the foregoing statutes and case law do not apply ... because [defendant's] claim does not require consideration of apportionment." *Archambault,* 287 Conn. at 39–40, 946 A.2d 839. *See also Owens,* 84 S.W.3d at 548–49 (same).

In particular, the *Owens* court addressed a defendant's decision not to seek apportionment of liability under Missouri's comparative negligence statute. The court rejected the argument that " 'any other person's negligence absolutely ceased to be an issue' when Dr. Dougherty did not seek apportionment of fault." *Id.* at 548. Rather, the court explained that "there is a distinction between sole cause and apportionment of fault.... [t]he issue ... is not apportionment, but the alleged negligence of [the defendant]." *Id.* (internal citation omitted). Accordingly, the court held that even though comparative negligence did not apply, the defendant nevertheless had a "right to contend that the negligence of someone else, even a non-party, was the sole cause of the incident in question." *Id.* at 548–49. For this reason, the court concluded that, "[w]hile there was evidence to support a submission of Dr. Dougherty's negligence, Dr. Dougherty had the right to have the jury consider the evidence and his contention that the negligence of others was the sole cause of Decedent's death." *Id.* at 549. The court granted a new trial in light of the "unavoidable fact [ ] that the jury was specifically instructed not to consider an issue that Dr. Dougherty had a right to have considered." *Id.*

Similarly, in *Archambault*, a Connecticut defendant chose not to "file[ ] an apportionment complaint against [a non-party] . . . [and instead] attempt[ed] to proceed under a general denial to adduce evidence of [the non-party's] alleged negligence." *Archambault*, 287 Conn. at 40, 946 A.2d 839. The Connecticut Supreme Court held that, "the issue in the present case is whether the defendant may introduce evidence that a nonparty employer's negligence was the sole proximate cause of the plaintiff's injuries so as to escape liability altogether. Accordingly, the legal principles of apportionment . . . do not apply. . . ." *Id.* at 39–40, 946 A.2d 839. The court recognized, however, that, "if there was any question that the [non-party]'s negligence was *not* the sole proximate cause of the plaintiff's injuries" the defendant would be "held liable for all, rather than some proportionate share, of the plaintiff's damages" where no apportionment claim is filed. *Id.* at 40, 946 A.2d 839.

*Archambault* is particularly illustrative of our basis for concluding that the cases cited from other jurisdictions are persuasive, despite the fact that they originated in comparative negligence jurisdictions. When apportionment of liability is not implicated, a defendant's liability in a comparative negligence state mirrors a defendant's liability under Maryland's contributory negligence system. For example, in *Archambault*, because the defendant did not seek apportionment, the defendant would be held 100 percent liable for the plaintiff's injuries if the defendant was found to be "a" cause of injury. For this reason, evidence of a non-party's negligence was deemed relevant to the defense that the defendant was not "a" cause of injury, because a non-party was the sole cause of the plaintiff's injury. Likewise, in the instant case, the Hospital's defense was that it was not "a" cause of injury because Midwife Muhlhan was solely responsible for Martinez's injuries. If the Hospital's defense was successful, it would not be liable to Martinez.[26] On the other hand, if the

---

26. Indeed, Martinez recognizes that the Hospital would not be liable if "[Midwife] Muhlhan was found to be the sole cause of [Martinez]'s

Hospital was found to be even "a" cause of injury, the Hospital would be liable for 100 percent of Martinez's injuries, regardless of any injury caused by Midwife Muhlhan.

Martinez also argues that our focus on the complete denial of liability is misplaced. In particular, Martinez cites *McDonnell* for the proposition that the "issue of whether a defendant is entitled to argue to the jury that the nonparty physician was negligent is separate and distinct from the issue of whether a defendant is entitled to have the jury instructed on the defense of sole proximate cause." *McDonnell,* 249 Ill.Dec. 636, 736 N.E.2d at 1085–86. "[E]vidence of the nonparty's negligence is not required to justify the sole proximate cause instruction." *Id.* Martinez concludes that this undercuts our reliance on case law from other jurisdictions in holding that evidence of a non-party's negligence is relevant to a defendant's complete denial of liability in a negligence action. We disagree. The court in *McDonnell* explained that a defendant may assert a complete denial of liability as a defense, but is not *required* to present evidence of another party's negligence in order to invoke that defense. This has no bearing on whether evidence of a non-party's negligence is *relevant.* Moreover, the many cases cited *supra* have clearly held that evidence of a non-party's negligence *is* relevant when a defendant asserts a complete denial of liability.

Accordingly, because comparative negligence and apportionment of fault were not implicated in the cases cited from other jurisdictions, and because the cases involved actions in which defendants asserted a complete denial of liability, we see no reason to distinguish the rationale of our sister jurisdictions.

### iii. Probative Value–Unfair Prejudice of Midwife Standard of Care

Next, Martinez argues that even if the evidence at issue is deemed relevant, the probative value is "vastly outweighed by

injuries." In that case, Martinez concludes, "the jury [would have been] obligated to find for the Hospital. . . ."

potential for unfair prejudice, confusion of the issues, and waste of time...." We disagree. Indeed, the probative value of the evidence of the midwife standard of care, and Midwife Muhlhan's breach of that standard of care, if any, during her treatment of Ms. Fielding, outweighs any potential for unfair prejudice, confusion, or waste of time.

We review a trial court's exclusion of evidence pursuant to Maryland Rule 5–403 under the abuse of discretion standard. "When weighing the probative value of proffered evidence against its potentially prejudicial nature, an abuse of discretion in the ruling may be found where no reasonable person would share the view taken by the trial judge." *Consol. Waste Indus. v. Std. Equip. Co.*, 421 Md. 210, 219, 26 A.3d 352 (2010) (internal quotation omitted).

Maryland Rule 5–403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403. Maryland Rule 5–401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401.

Here, the trial court precluded the evidence at issue on the basis that it was "prejudicial and is not relevant to the case." The trial judge's concern for prejudice was due to the "potential prejudice from the jury feeling there is a third-party here, who is not a party to the action." We reiterate that the issue of admissibility of a non-party's negligence is an issue of first impression in Maryland. The trial judge seemingly found the evidence prejudicial for the very same reason we deem it relevant. As discussed *supra*, when a defendant asserts a complete denial of liability, the jury *should* be made aware of an alleged non-party tortfeasor, in order to provide a complete story to the jury. Accordingly, we necessarily conclude that the trial court abused its discretion in precluding the evidence

due to the perceived prejudice resulting from the jury's awareness of a non-party.

Martinez also alleges other grounds for prejudice and confusion. In particular, Martinez cites cases which have held that a different standard of care applies to obstetricians and midwives, and that other jurisdictions have precluded obstetricians from offering standard of care testimony regarding midwifery practices. *See, e.g., Postell v. Hankla,* 317 Ga.App. 86, 728 S.E.2d 886, 889 (2012); *McElhaney ex rel. McElhaney v. Harper–Hutzel Hosp.,* 269 Mich.App. 488, 711 N.W.2d 795, 800 (2006); c.f. *Cox v. M.A. Primary and Urgent Care Clinic,* 313 S.W.3d 240, 256 (Tenn.2010) (discussing rationale for applying different standard of care to physician assistants than applied to physicians). Accordingly, Martinez maintains that the "admission of separate, distinct standard[s] of care could easily confuse jurors, especially when the verdict sheet and instructions would make no reference to the midwife's breach of the standard of care because she was not a party and her negligence, if any, was neither a necessary nor sufficient predicate to the Hospital's defense."

The Hospital counters that the differing standards of care for physicians and midwives actually supports the admission of the excluded testimony. In the Hospital's view, the differing standards of care underscores the Hospital's need to show the jury Midwife Muhlhan's "gross violations of the standard of care because the outrageousness of her treatment methods was far from clear to a lay jury. This was especially true here because [Martinez's] witnesses and attorneys repeatedly told the jury that there was no dispute that *hospitals* do not use fundal pressure and IM Pitocin to create the false impression that some competent midwives do use these methods."

We are not persuaded by Martinez's arguments. Although Martinez cites authority to suggest that different standards of care would apply to midwives and obstetricians, Martinez presents no authority to support its contention that it would be *prejudicial or confusing* to present evidence of differing standards of care to a jury. We fail to see how explaining to a

jury that two different standards of care apply to two different medical professionals would be unduly confusing. "Jurors generally are presumed to follow the court's instructions...." *Dillard v. State*, 415 Md. 445, 465, 3 A.3d 403 (2010) (citations omitted). Similarly, the prejudice Martinez would face is not the type of prejudice contemplated by Maryland Rule 5–403. "The fact that evidence prejudices one party or the other, in the sense that it hurts his or her case, is not the undesirable prejudice referred to in Rule 5–403." *Odum v. State*, 412 Md. 593, 615, 989 A.2d 232 (2010). Rather, "[p]robative value is outweighed by the danger of 'unfair' prejudice when the evidence produces such an emotional response that logic cannot overcome prejudice or sympathy needlessly injected into the case." *Id.* (internal citation and quotation omitted). Accordingly, we hold that the probative value of the evidence of the midwife standard of care, and Midwife Muhlhan's breach of that standard of care, if any, during her treatment of Martinez, outweighs any potential for unfair prejudice, confusion, or waste of time.

### iv. Harmless Error

Finally, Martinez argues that any error attributable to the trial court's exclusion of evidence was harmless. In support, Martinez cites the testimony provided by various Hospital witnesses regarding causation. Martinez concludes that evidence of the midwife standard of care would have provided a "*de minimus* boost to [the Hospital's] theory of defense ... [which] suggests that the Hospital was not prejudiced."

The Hospital contends that it was unfairly prejudiced because it could not "present expert witness testimony that Midwife Muhlhan breached the applicable standard of care for patient safety when she: (1) allowed Ms. Fielding to attempt home delivery past 41 weeks and labor through prolonged first and second stages; (2) administered intramuscular Pitocin in an uncontrolled setting as many as three times; and (3) applied fundal pressure to try to force the baby's head through the birth canal." Accordingly, the Hospital con-

cludes, the jury had a materially incomplete picture of the case. Moreover, the Hospital asserts that Martinez exploited the trial court's ruling "to give the jury the false impression that Midwife Muhlhan did her job competently, but that the Hospital simply does not understand that midwives practice differently than obstetricians in hospitals. The Hospital was entitled to respond." We agree with the Hospital that the preclusion of evidence was not harmless.

Our sister jurisdictions have consistently held that when a defendant was precluded from presenting evidence of a non-party's negligence, the defendant was entitled to a new trial. *See, e.g., Petre, supra,* 356 Ill.App.3d at 66–67, 291 Ill.Dec. 867, 824 N.E.2d 1117 (remanding for new trial and holding that "defendants will [ ] be allowed to assert an empty chair defense and admit evidence of the [non-party] physicians' alleged postoperative negligence on the issue of proximate cause"); *Archambault,* 287 Conn. at 41, 946 A.2d 839 (holding that because the trial court erred in precluding the defendant from presenting evidence of a non-party's negligence, the defendant "is entitled to a new trial"); *Owens,* 84 S.W.3d at 548–49 (holding that "[w]hile there was evidence to support a submission of [defendant's] negligence, [the defendant] had the right to have the jury consider the evidence and his contention that the negligence of others was the sole cause of Decedent's death" and granting a new trial in light of the "unavoidable fact [ ] that the jury was specifically instructed not to consider an issue that [the defendant] had a right to have considered.").

We reiterate the well-reasoned holding of *Archambault* that a defendant is entitled to "try to convince the jury that not only did it *not* cause [the] plaintiff's injuries, but someone else *did.* A void of evidence concerning the [non-party's] conduct would leave a logical hiatus in the story presented to the jury. With no one allowed to show what part the [nonparty's] conduct played, the jury would be left to wonder whether anyone other than the defendant *could* have caused [the] plaintiff's injuries." *Archambault, supra,* 287 Conn. at 32–33, 946 A.2d 839.

Here, there was a logical hiatus in the story presented to the jury.[27] Moreover, Martinez's arguments and testimony at trial buttressed the prejudice to the Hospital. Indeed, in opening statements, Martinez's counsel described Midwife Muhlhan as a "Certified Nurse–Midwife" who "had been practicing for over 40 years." Martinez's counsel explained that Midwife Muhlhan had previously delivered Ms. Fielding's sister's baby, which was "a wonderful experience." Further, Martinez's counsel informed the jury that Midwife Muhlhan's actions were "completely appropriate" when she broke Ms. Fielding's water. Martinez's counsel further argued that Midwife Muhlhan gave Pitocin because she "wanted to get this baby delivered as safely and quickly as possible."

At trial, Martinez's experts provided opinions about the practice of midwives. For example, Dr. Balducci testified he did not understand why the Hospital personnel were shocked when they learned that Midwife Muhlhan had administered Pitocin, observing that "I think I've seen midwives use this before in delivery centers. . . ." Dr. Balducci also opined on the differences between hospital practice and midwifery practice, observing, "[w]ell, that's the way midwives will practice." Dr. Stokes similarly clarified that his testimony pertained only to obstetrics, stating: "That's the way obstetricians do it. It's not the way midwives do it." Although the trial court sustained objections to the testimony about midwives,[28] the Hospital argues that the curative instruction was not sufficient. The trial judge informed the jury that, "you're to disregard the comment about what midwives do or don't do. That's not an issue in this case." In the Hospital's view, the trial court's instruction "effectively told the jury that the Hospital's central theory of the case—that the damage was done by the midwife

---

**27.** *See supra,* Part C(i), discussing the void created by the preclusion of evidence of the midwife standard of care.

**28.** *See supra,* Factual and Procedural Background, Part C(i) (citing the testimony at trial about midwives and the objections that were sustained).

*before* Ms. Fielding and her baby arrived at the Hospital—was 'not an issue in this case.' "

During closing arguments, Martinez's counsel derided the Hospital's "shock" at Midwife Muhlhan's conduct, suggesting that her actions, including fundal pressure and administration of Pitocin, were perfectly appropriate. In particular, Martinez explained that: "You know what Pitocin's for. It's to increase contractions. Why? Because consistent with what mom said, she wasn't really having strong contractions at home. That's why they gave it to her." Martinez concluded that both the administration of Pitocin and the fundal pressure "didn't cause her any pain, anything like that. It was not a big deal."

The Hospital also points out that by limiting the Hospital to merely reciting the facts of Midwife Muhlhan's conduct and its immediate reactions when learning of it, the jury could have formed a false impression that Midwife Muhlhan's treatment was benign. Moreover, the Hospital asserts that negligent care is more dangerous and likely to cause injury than non-negligent care. Thus, Midwife Muhlhan's negligence would have significantly added credibility to the Hospital's defense that Midwife Muhlhan's negligence injured Martinez before he ever reached the Hospital. The Hospital concludes by observing that a jury is not likely to be particularly moved by testimony that the defendant blames someone else, unless there is proof that the other person actually did something that should not have been done. In our view, these implications further support our holding that the trial court erred in precluding the hospital from introducing evidence related to the standard of care with Midwife Muhlhan's treatment of Ms. Fielding.

In sum, the effect of the trial court's ruling was that Martinez was permitted to argue to the jury that Midwife Muhlhan's treatment of Martinez was appropriate. The Hospital, however, was precluded from arguing that Midwife Muhlhan's actions were negligent. Consequently, the only evidence of negligence before the jury was the alleged negligence of the Hospital. It follows, therefore, that the jury was left to wonder whether anyone other than the Hospital *could*

have caused Martinez's injuries. In our view, the jury was provided a materially incomplete picture, and the Hospital was unnecessarily constrained in presenting its defense that Midwife Muhlhan was the sole cause of Martinez's injuries. Accordingly, we hold that the error here had a "substantial likelihood of causing an unjust verdict." *See Isley v. State,* 129 Md.App. 611, 619, 743 A.2d 772 (2000). The Hospital, therefore, is entitled to a new trial.[29]

## B. Informed Consent

Next, the Hospital argues that Martinez was improperly permitted to introduce evidence that the Hospital did not offer general anesthesia to Ms. Fielding. In the Hospital's view, any testimony suggesting that physicians should have "offered" general anesthesia—as opposed to another type of anesthesia—constitutes an informed consent claim. By contrast, Martinez argues that "the failure to offer treatment required by the standard of care states a claim in ordinary malpractice, not informed consent." Additionally, Martinez contends that the testimony at issue was "relevant to rebutting [the Hospital's] express and implied claims that Ms. Fielding was to blame for any delay in delivering Martinez and that she had rejected general anesthesia."[30] Regardless, Martinez contends that the Hospital's argument is not preserved for appellate review.

We address the merits of the informed consent issue in order to provide guidance for future proceedings on remand.[31]

---

**29.** Because we are reversing and remanding for a new trial based on the error in granting the motion *in limine,* we need not address the issue associated with the trial judge's denial of the motion for new trial.

**30.** The trial court explained that it allowed the informed consent evidence to prove that Ms. Fielding's lack of consent was not the reason the Caesarean section procedure was delayed. The record, however, is devoid of any testimony suggesting that Ms. Fielding had refused general anesthesia.

**31.** *See supra,* Part II (A), remanding for further proceedings due to the trial court's preclusion of evidence regarding the midwife standard of care, and Midwife Muhlhan's breach of that standard of care.

We conclude that the trial court abused its discretion in admitting the challenged evidence.

"Simply stated, the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment." *Sard v. Hardy,* 281 Md. 432, 440, 379 A.2d 1014 (1977) (internal citations omitted). "This duty to disclose is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment." *Id.* at 440, 379 A.2d 1014 (internal citations omitted). However, the doctrine of informed consent does not apply in emergencies. *Id.* at 445, 379 A.2d 1014 ("the physician's duty to disclose is suspended where an emergency of such gravity and urgency exists that it is impractical to obtain the patient's consent.").

The "law is settled that '[a] party cannot allege one cause of action and introduce evidence to prove another and different one.'" *Zeller v. Greater Balt. Med. Ctr.,* 67 Md.App. 75, 82, 506 A.2d 646 (1986) (citing *McTavish v. Carroll,* 17 Md. 1 (1861)). "Breach of informed consent must be pled as a separate count of negligence." *Schwartz v. Johnson,* 206 Md.App. 458, 484, 49 A.3d 359 (2012) (citing *Zeller,* 67 Md.App. at 83, 506 A.2d 646). Under Maryland law, informed consent evidence cannot be admitted if there is no informed consent claim. *Id.* at 485, 49 A.3d 359 (citations omitted) (holding that "evidence of informed consent ... is both irrelevant and unduly prejudicial in medical malpractice cases without claims of lack of informed consent"). This is because "claims of informed consent and medical malpractice are 'separate, disparate theories of liability....'" *Id.* at 484–85, 49 A.3d 359 (citing *McQuitty v. Spangler,* 410 Md. 1, 18,

976 A.2d 1020 (2009)). "Knowledge by the trier of fact of informed consent to risk, where lack of informed consent is not an issue, does not help the plaintiff prove negligence. Nor does it help the defendant show he was not negligent." *Id.* (citations omitted). Instead, "whether the plaintiff patient had given informed consent to [a] procedure generally is irrelevant and carrie[s] a great potential for the confusion of the jury in an action wherein only medical malpractice is pleaded . . . ." *Id.* (internal quotations omitted). "The purpose behind this principle is clear. A defendant must have notice of the allegations lodged so he or she can use his or her best efforts to disprove the charges." *Zeller,* 67 Md.App. at 82, 506 A.2d 646.

The Court of Appeals has held that the failure to offer diagnostic testing "is properly an allegation of medical malpractice, not one of breach of informed consent." *McQuitty,* 410 Md. at 18, 976 A.2d 1020 (citing *Reed v. Campagnolo,* 332 Md. 226, 240–41, 630 A.2d 1145 (1993)). In *Reed,* the plaintiff pursued an informed consent action arising from a physician's failure to offer prenatal testing that would have revealed complications pertaining to the plaintiff's unborn child. *Id.* at 229–30, 630 A.2d 1145. On appeal, the Court considered whether the plaintiff alleged an informed consent claim, or whether the cause of action sounded only in ordinary negligence. *Id.* at 240–41, 630 A.2d 1145. Ultimately, the *Reed* Court concluded that the question of "whether the defendants had a duty to offer or recommend the tests is analyzed in relation to the professional standard of care." *Id.* at 241, 630 A.2d 1145.

Here, Martinez's complaint alleged that the Hospital breached its standard of care by failing to timely perform an "urgent" Caesarean section or by failing to later convert to an "emergency" Caesarean section when the fetal heart rate allegedly changed. *See* Factual and Procedural Background, *supra.* Spinal/epidural anesthesia is appropriate for an urgent Caesarean section, whereas general anesthesia is used for an emergency Caesarean section. *See* footnote 10, *supra.* An emergency Caesarean section is only performed when the life of the mother or baby (or both) is in imminent danger.

*See* footnote 10, *supra. Sard v. Hardy* makes clear that informed consent does not apply in emergencies. *See Sard, supra,* 281 Md. at 445, 379 A.2d 1014. Thus, if the circumstances here called for an emergency Caesarean section, as Martinez was asserting, there was no obligation to obtain Ms. Fielding's informed consent. Rather, if an emergency Caesarean section was required, the Hospital was obligated to administer general anesthesia immediately and deliver the baby. Accordingly, evidence of whether Ms. Fielding was *offered* general anesthesia is not relevant to whether the Hospital breached its standard of care by allegedly failing to convert to an emergency Caesarean section.

Our review of the record shows that the testimony at trial regarding general anesthesia focused on whether Ms. Fielding was *offered* general anesthesia. Martinez concluded in closing argument that the question for the jury was whether a reasonable mother would have agreed to undergo general anesthesia in order to save her child. In particular, Dr. Stokes testified on direct examination that the "*option* [of general anesthesia] was never *offered* to the patient." (Emphasis added). Additionally, Dr. Stokes testified that the Hospital "did not *offer* the option of being put to sleep, which would have gotten her baby out a whole lot sooner." (Emphasis added). Martinez's counsel asked Ms. Fielding whether she was "ever given a *choice* between general anesthesia versus a combined spinal-epidural." Ms. Fielding testified: "No. I was never given that *option.*" During cross-examination of Dr. Michael Katz, Martinez's counsel asked: "[W]as Ms. Fielding, the patient, ever given the *choice* of which anesthesia?" (Emphasis added). Finally, in closing argument, Martinez concluded that:

> They want to say, oh my God, the risks. It's a one percent risk. There is a risk for anything. . . . Ask any mother in that situation. . . . What would any mother, any reasonable mother in that circumstance do? We've got nine women on this jury. You all know what you would do. You would say give me the general anesthesia. . . . She wasn't even given the option. . . .

■ In sum, the evidence presented by Martinez focused on whether Ms. Fielding—the patient—was given a *choice* of anesthesia and whether a *reasonable patient* would have accepted the *risks* of such treatment in order to save her child. Since the Hospital had no obligation to obtain informed consent to administer general anesthesia for an emergency Caesarean section, evidence of whether Ms. Fielding was *offered* general anesthesia had no relevance to Martinez's negligence claim.[32]

■ Moreover, the evidence was prejudicial because it was improperly used to conflate the negligence issue with an unpled informed consent claim.[33] We reiterate that "whether the plaintiff patient had given informed consent to [a] procedure generally is irrelevant and carrie[s] a great potential for the confusion of the jury in an action wherein only medical malpractice is pleaded...." *Schwartz,* 206 Md.App. at 485, 49 A.3d 359 (internal quotations omitted). *See also Cobbs v. Grant,* 8 Cal.3d 229, 238, 104 Cal.Rptr. 505, 502 P.2d 1 (1972) (en banc) (vacating jury verdict that intertwined medical negligence and informed consent and holding that where "it is impossible to determine on which theory the jury verdict rested ... it is reasonably probable there has been a miscarriage of justice."); *Dingle v. Belin,* 358 Md. 354, 367, 749 A.2d 157 (2000) ("care must be taken to keep the actions [of negligence and informed consent] separate and not to allow the theories, elements, and recoverable damages to become improperly intertwined."). The challenged evidence here carried with it a great potential for confusion of the jury. Ac-

32. We observe that evidence regarding whether or not the Hospital performed an emergency Caesarean section would be relevant to Martinez's claim that the Hospital breached its standard of care by failing to convert to an emergency Caesarean section. Critically, however, Martinez's line of questioning, and the testimony elicited from witnesses, went far beyond this scope.

33. In a negligence action, the question is whether the *defendant* breached his or her duty of care. *See McQuitty, supra,* 410 Md. at 25–26, 976 A.2d 1020. By contrast, in an informed consent action, the jury considers the choice of treatment, and any associated risks, from the perspective of the *reasonable patient. Id.*

cordingly, for guidance on remand, we conclude that the trial court abused its discretion in admitting evidence that Ms. Fielding was not "offered" general anesthesia.

In light of our decision to reverse and remand this case for a new trial, we need not address the other issues raised by the Hospital in this appeal, which pertain to the sufficiency of the evidence to support the jury award, and the annuitization of the jury award.

For the foregoing reasons, we hold that the circuit court abused its discretion in precluding evidence of the midwife standard of care, and evidence of Midwife Muhlhan's breach of that standard of care during her treatment of Martinez. Additionally, for purposes of remand, we conclude that, under the circumstances, the circuit court abused its discretion in admitting evidence that Ms. Fielding was not offered general anesthesia. Accordingly, the judgment is reversed and the case is remanded for further proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT/CROSS–APPELLEE.**